UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

United States of America,      )
                               )
          Plaintiff,           )
                               )
     vs.                       )     Case No. 1:20CR14
                               )
Amanda Gunn a/k/a Amanda       )
Howard,                        )
                               )
          Defendant.           )
_____)


SENTENCING HEARING
BEFORE THE HONORABLE J. RANDAL HALL
CHIEF UNITED STATES DISTRICT COURT JUDGE
TUESDAY, MAY 24, 2022; 2:01 P.M.


FOR THE PLAINTIFF:

     Tara M. Lyons, Esquire
     U.S. Attorney's Office
     Post Office Box 2017
     Augusta, Georgia 30903
     (706)724-0517

FOR THE DEFENDANT:

     Frank Adam Nelson, Esquire
     631 Ronald Reagan Drive, Suite 201
     Evans, Georgia 30809
     (706)434-8770

OFFICIAL COURT REPORTER:

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468

1          (Call to Order at 2:01 p.m.)

2              THE CLERK:  The court calls case number 1:20CR14.  The

3   United States of America v Amanda Gunn.  Tara Lyons for the

4   government.  Adam Nelson for the defendant.  Here for

5   sentencing.

6              THE COURT:  Is the government ready to proceed?

7              MS. LYONS:  Yes, Your Honor.

8              THE COURT:  Mr. Nelson, are you ready to proceed?

9              MR. NELSON:  Yes, Judge.

10             THE COURT:  Amanda Gunn appeared before this Court on

11  November 4, 2021, accompanied by her attorney, Mr. Adam Nelson,

12  for a Rule 11 proceeding.  Pursuant to a plea agreement

13  Ms. Gunn plead guilty and was adjudged guilty of count one of

14  the Superceding Indictment charging her with sex trafficking

15  conspiracy in violation of 18 U.S.C. § 1594(c).  Upon

16  completion of the Rule 11 proceeding and this Court's

17  acceptance of the guilty plea, the Court directed the probation

18  office to prepare a Presentence Report and to disclose the

19  report to the government and to Ms. Gunn.

20             Ms. Lyons, have you had a sufficient amount of time to

21  review the Presentence Report?

22             MS. LYONS:  Yes, Your Honor.

23             THE COURT:  And you have no outstanding objections;

24  correct?

25             MS. LYONS:  None.

1          THE COURT:  Mr. Nelson, have you and Ms. Gunn

2    completed your review?

3          MR. NELSON:  Yes, Judge.

4          THE COURT:  And there are no outstanding objections?

5          MR. NELSON:  No, Your Honor.

6          THE COURT:  There being no objections to the factual

7    statements or as to the probation officer's conclusions as to

8    the applicable advisory guidelines contained in the report, the

9    Court adopts those facts and conclusions.  Accordingly, the

10   Court determines that the applicable advisory guidelines are

11   total offense level 38, criminal history category I, 235 to 293

12   months of imprisonment, five years to life of supervised

13   release, $50,000 to $250,000 fine.

14          I believe I understood the restitution has been agreed

15   to; is that correct?

16          MS. LYONS:  That's correct.

17          THE COURT:  And that is $800,000?

18          MS. LYONS:  Correct, Your Honor.

19          THE COURT:  All right.  $800,000 of restitution and a

20   $100 special assessment.  With the adoption of the applicable

21   guidelines now, for purposes of sentencing, the first thing I

22   want to do is to hear testimony from the victim in this case or

23   anyone on behalf of the victim if, in fact, those statements

24   are being offered today.

25          MS. LYONS:  Your Honor, first we would offer a

1    statement from the custodian of the minor victim in this case,

2    Mrs. Ashley Coxwell.  Your Honor, I have spoken to Mr. Nelson

3    prior to starting this hearing.  He has agreed to allow the

4    minor victim to speak last today if Your Honor agrees with

5    that.

6              THE COURT:  That's fine.

7              MS. LYONS:  So we would ask Mrs. Coxwell to come to

8    the microphone, and, Your Honor, I failed to say since this is

9    an open courtroom today we will be doing our best not to use

10   the minor victim's full name, to refer to her as "minor victim"

11   or her initials for the purpose of any transcript or recordings

12   and we would ask that if anybody from the public or press is

13   here today to do the same.  Thank you.

14             THE COURT:  I would certainly direct that the minor's

15   name -- the privacy of the minor's name be respected in every

16   respect here today.  All right.

17             Ma'am, you may proceed.  For the record please state

18   your name and then we'll be glad to hear from you.

19             MRS. ASHLEY COXWELL:  My name is Ashley Coxwell.  I am

20   here not to pick sides as I do not know all the facts.

21   However, I can attest to the sister I once knew -- Amanda.

22   From a young age my sister was always a caring and shy person.

23   She has always been known for her compassionate heart and

24   caring dearly for her family.

25             Amanda had her first child who was a girl at a young

age.  Even though she was married to an abusive, drug-addicted husband -- Jacob -- she still managed to keep her daughter safe.  She left the situation to keep her and her daughter out of harm's way, and as a single mother she provided for them both.  That was until she reconnected with Peyton.  He charmed all of us into thinking he was a good guy.

I noticed during Amanda and Peyton's marriage they struggled with money.  To me that seemed strange because Amanda was never afraid to work.  I employed Amanda and for me she did great.  She was a star employee.  She broke record goals.  She did not have an attendance issue and showed up to work on time.  That was until Peyton made her quit.

Looking back on it now I can see that whenever Amanda would start doing good in a job or succeeding Peyton would make her quit or even if she started going to the gym and started feeling good about herself, he would take a part away from her.  He wanted to control her.  It is unfortunate the only two relationships Amanda was in that went from husband to boyfriend status was not with so nice individuals.

Amanda having bad judgment on men does not make her a bad mother.  In fact, I remember when Amanda was pregnant with her daughter she worked up until the very day she gave birth with swollen feet and all.  When she had her son with Peyton, Amanda still tried to work and provide when she was allowed to.

No one will ever know everything that happened in the

1    Gunn household, but we do know that Peyton Gunn made his wife

2    and daughter victims of his sick torture games.  Amanda was

3    raped, beaten, made to stand on street corners with degrading

4    signs, drugged, gang-raped, covered with multiple degrading

5    names and so much more.

6            She was brainwashed for years in that believing a fake

7    organization called the Order would kill or harm her or her

8    family if they did not obey what they were instructed to do.

9    Peyton also had the daughter believing in the same fake

10   organization.  Even after Peyton's arrest both Amanda and my

11   niece believed the group would come find and harm them.  It

12   took months for them to both understand the group was not real

13   and it was him all along.

14           Peyton brainwashed them as Jim Jones did his cult

15   members in Jonestown back in 1978.  A more recent comparison

16   would be the event of Waco, Texas with David Koresh and his

17   followers in 1993.  Both David and Jim were masters of

18   manipulation.  They both had hundreds and hundreds of people

19   believe and trust in them when they had no hard evidence for

20   their beliefs or practices -- just their words.

21           I personally read online remarks where Amanda was

22   being called a slut, whore, and so much more with pictures

23   attached.  Peyton even put a picture of my sister and my

24   mother's driver's license listing their home address where they

25   both lived on these pages he made and posted.  Peyton had our

whole family living in fear.  He would somehow find out places

my brother went to out of town, private conversations my mother

and I would have when no one else was in the house, hacked my

business computers and my accounts.  To one point if me and my

mom wanted to have any private conversations we would have to

go to a restaurant and leave our phones in the car because we

did not know where he hid all the tracking devices and bugs.

My point is that he was and still is a monster to this

day.  It is easy for people to say, "Well, she could have

left."  Well, as a survivor of domestic violence I can say it

is not always that easy.  People can always make assumptions

about what was going on and who knew what, but no one will ever

know the truth.  The only people who will ever know the truth

is Amanda, Peyton, my young niece, and the hundreds of men that

Amanda and her daughter were forced to have sex with while

being drugged.

When Peyton was arrested and my sister was allowed to

be on her own two feet again I saw the old Amanda, the strong

sister that I knew she was.  She was caring for her son and

living in a house she was paying for.  She was working and free

from the slavery of Peyton.

A person who is not often mentioned in this case is

the young son.  He is a victim since he has no parents to raise

him.  He is being raised by his two elderly, retired

grandparents who should be spending their retirement years for

1  them, not raising a child.  This young boy needs a mother who

2  once loved and cared for him.  Thank you.

3          MS. LYONS:  That's all the government offers at this

4  time, Your Honor.

5          THE COURT:  Okay.  Mr. Nelson, I will now look to you

6  for information that you would like to offer in mitigation of

7  the sentence.

8          Now, Ms. Gunn, as part of this stage of the hearing

9  you have what is called the "right of allocution."  That means

10  you have a right to make a statement to me on any sentencing

11  issue, on anything in mitigation of the sentence.  You have the

12  right to do so.  You are not required to do so, but if that is

13  something that you would choose to do, then I'll be happy to

14  hear from you, but I'll begin with Mr. Nelson.

15          MR. NELSON:  Thank You, Judge, and just by way of

16  procedure, I've got some folks in the room, too, Judge.  If we

17  could, I'll go, they'll go, and then Ms. Gunn goes.

18          THE COURT:  Fine.  I'll leave it up to you.

19          MR. NELSON:  Thank you, Judge.

20          THE COURT:  I'll let you be the conductor.

21          MR. NELSON:  Well, Judge, I'll start with introducing

22  the room.

23          THE COURT:  Sure.

24          MR. NELSON:  So with me today on behalf of Amanda I've

25  got several folks that I wanted to point out.  Amanda's parents

1   Kathy and John Howard are here.  Mike and Jill Gunn, Peyton

2   Gunn's parents are here.  Jason Howard, Amanda's brother;

3   Ashley Coxwell, her sister who we just heard from; her husband

4   Asa is here.  I've got friends Patricia Jackson, Vickie

5   Davenport, Natalie George, Dory Molton, Wendy Buckner, Stacey

6   Heimer, Brad Heimer, Nell Buckner.

7          I start with that, Judge, because I've been in this

8   courtroom 25 plus times on sentencing and I have never had more

9   than two people with me in the courtroom.  I highlight that

10  fact to impress upon how important this case is and how

11  important Amanda Gunn is to the folks that are here.

12         Most of the time when I'm here, Judge, we have a

13  factual account that's provided that gives context to what took

14  place in this case.  That's not necessary because there was a

15  full trial -- a trial filled with testimony and physical

16  evidence that paint a truly horrendous account of what I would

17  describe as unspeakable terror.

18         Amanda married in 2010 Peyton Gunn and that began an

19  elaborate scheme based on false claims of violence that led to

20  rape, sexual abuse, physical and mental torture, prostitution,

21  horrors that ordinarily are only thought of in imagination.

22  Personally, just having to interact with this case has been

23  taxing.

24         I now have a new unlimited appreciation for Ms. Lyons,

25  Officer Godbee, and all federal employees who work in this

1   area.  This case, the trial prep, interacting with discovery,

2   talking about the case has had a toll on Amanda.  Now the

3   intricacies of the law that she was charged with made

4   resolution somewhat difficult, but foremost in Amanda's mind in

5   all this case was avoiding trial.  She did not want to be the

6   reason that the minor victim had to go through trial.  She

7   agreed to testify against her co-defendant and plead guilty to

8   the crimes she was charged with all in hopes of avoiding a

9   trial and freeing her daughter of this burden for which the

10  government has provided a 5K Motion and a motion under

11  18 U.S.C. § 3553(e).

12          Judge, I have stood before you on several occasions

13  and pontificated about what I think the purpose of sentencing

14  is and what our role is in our judicial system, and I'll speak

15  to that a little bit again today, but there is one thing that's

16  different about this case in particular.  I believe that this

17  sentencing today is pivotal and critical to the healing of this

18  family.  I have told Amanda and I've told her family that I

19  believe this is a step in the process.

20          This court cannot undo Amanda's motherhood any more

21  than it can undo the harm to the victims.  The judgment in this

22  court -- of this Court in sentencing in my opinion sets this

23  family back towards wholeness.  I can't guarantee they will get

24  there, but it's not until this happens today that that path

25  can't be begun.

1        Now I think our judicial system looks at several

2   goals, but the two that stand out to me most often are

3   punishment and rehabilitation.  On the punishment I think the

4   testimony, the evidence is clear Amanda has suffered horribly.

5   She's lost autonomy in both body and mind.  She's lost her

6   family.  She has suffered irreparable harm that she will carry

7   for the rest of her life and she will also carry with her the

8   knowledge that she played a role in that to her minor children.

9   I don't say this to absolve Amanda.  Truly, it's only to

10  contextualize the actions or inactions of Ms. Gunn.

11       On rehabilitation I have heard testimony.  I have seen

12  the effects of mental healthcare for Ms. Gunn.  I believe that

13  a lengthy incarceration will not help that problem.  Instead, I

14  believe that the healthcare that she needs to become whole is

15  in the world, not in a federal prison or other program.  When

16  considering sentencing, I ask that those be the factors that

17  this Court keep in mind.

18       I have known Amanda for the better part of two years.

19  My impressions are that she is severely traumatized.  She

20  suffers distraught, despair at the thought of what has happened

21  to her children and her family.  I would liken my relationship

22  to her, especially over the time, as someone coming out of a

23  fog.  I have no knowledge of what that might be like living in

24  a situation where you don't know reality to be true, but

25  through all that the one thing I've found constant was her

1   dedication to her children.

2           The testimony of the witnesses will tell us that

3   Amanda provided for her kids.  She was the breadwinner.  Even

4   in the midst of all the things she was suffering from she

5   provided as best she could.  The extreme torture she was

6   subjected to, however, led to a terrible set of circumstances

7   where she will admit resulted in harm to her minor children,

8   and faced with criminal prosecution, loss of liberty, and

9   having to relive this pain, she has maintained her appreciation

10  for this happening.

11          There's testimony at trial that Amanda attempted

12  suicide.  That was discussed this morning during the

13  co-defendant's sentencing.  In her way that was the only way

14  out, but it's through this proceeding she realizes that her

15  children were saved because of the investigation.  She's

16  willing to bear the consequences of the prosecution and

17  investigation.

18          Judge, I have a tendency to insert myself in

19  sentencing hearings.  I have stood before you and compared

20  myself to my clients and said there are systematic failures in

21  society that put this person in this position or this person

22  had a lack of resources and that's where they found themselves,

23  but in this case surrounded by the victims of all of this

24  heinous terror, I find it impossible to contextualize

25  personally.

1          I assume this has been one of the most difficult cases
2    handled by this Court, but I can relate to one thing and that's
3    the support system that this family presents.  I myself have
4    been blessed with a supportive family and I would say Amanda
5    has, too.  I have mentioned the family and friends and we'll
6    hear from them.  These are people that Amanda and her children
7    need:  Parents and grandparents, aunts and uncles, friends.
8          Judge, I didn't tell them this when I told them they
9    were going to be here today, but they are pledging to be a part
10   of the support system that this family needs.  My hope is that
11   they understand that obligation, that they have a willingness
12   to assist in the healing of this family, and I want to make
13   special notation of Peyton Gunn's parents.  They did not attend
14   their son's sentencing this morning.  They are here on behalf
15   of Amanda.  All of these people have suffered, Judge -- all of
16   them -- but I count their presence here as a better asset than
17   anything I could say or do for Amanda.
18          Judge, I've rambled.  I've rambled on here for a
19   while.  I think about what U.S. Attorney Lyons said this
20   morning:  When you sit down to think about what you're going to
21   say, it's very difficult to put words together.  So I'll sum it
22   up with this:  By sentencing Peyton Michael Gunn, this Court
23   carried out justice.  Peyton Michael Gunn should never be
24   allowed in society again.  The depths of his depravity, the
25   monstrosity of his cruelty, the attempts to dehumanize his

1    victims -- all of this has been rightly punished.

2           I would submit to the Court that the same principles

3    don't exist for punishment towards Amanda.  She should not be

4    subjected to it in the same way, but she does understand that

5    there is a price to pay, and, Judge, I would submit that she

6    will accept that.  I, however, ask that the sentence consider

7    what she suffered, the impact the torture had on her, her

8    willingness to testify against Michael Peyton Gunn, and the

9    capacity that exists to rehab her and her family.

10          I can't tell you, Judge, that this is the number I

11   think should be appropriate and it is dangerous for me to do

12   this, but, Judge, all I am asking for is the most lenient

13   sentence that this Court would be willing to entertain.  And,

14   certainly, it's not lost on me that whatever happens they'll

15   have to work beyond this courtroom.  There is no sentence --

16   there is no structure that this Court can put together, and

17   even if she walks out the door today or she walks out 30 years

18   from now, there is a long road ahead, but my belief is that

19   they'll work towards it and that with the absence of this

20   malicious monster they'll be able to get there.

21          Judge, just as a way of procedure, understanding that

22   there may be a sentence of incarceration today, we do ask for

23   the Court to recommend she be placed as close as possible to

24   the Augusta area.  Marianna in Florida, I believe, is the

25   closest women's facility, and, Judge, this may be a little bit

1   too complicated now to take up, but Ms. Gunn does have a minor

2   child that's not involved in the case, at least not as a part

3   of the prosecution.  I do want to be mindful in sentencing if

4   we could allow her to continue contact with the minor child,

5   understanding that that may be outside of the Court's ability

6   as well.

7           Judge, with that being said, I would turn to the

8   witnesses.  Not everybody that came today is going to speak,

9   but I do want to allow an opportunity for any of those that

10  will to have the opportunity to do so.

11          THE COURT:  Feel free to call whoever you'd like.

12          MR. MICHAEL GUNN:  Good afternoon.  My name is Mike

13  Gunn.  Judge Hall, thank you for the opportunity that I have to

14  address the Court today.  As a group of family and friends, we

15  come to speak as advocates for Amanda Gunn.  Based upon the

16  facts revealed by this case, we do not question Amanda's

17  culpability, but we do believe that her culpability is

18  overshadowed by her also being a victim -- a victim of

19  different types of abuse such as emotional, physical, and

20  sexual.  Her decisions were made under great duress and

21  threatened with the loss of her children.

22          My wife Jill and I have even heard our son Peyton make

23  the comment that Amanda would never leave him because he could

24  prove she was an unfit mother.  These were traits that we never

25  saw exhibited in Amanda.  All of this mess was perpetrated by

1   our son, Michael Peyton Gunn, who you sentenced this very

2   morning.  We collectively believe that his sentence is just and

3   should satisfy the rule of law.  We also believe that justice

4   has been served with this sentence, and we pledge to ensure

5   that Amanda will move on again to be the productive,

6   law-abiding citizen that she was raised to be.

7           We additionally pledge our time, our talents, and love

8   for her to ensure she achieves this goal.  Therefore, we humbly

9   request that the Court remand Amanda to our care and allow us

10  to mentor her back into a productive life.  As you know, there

11  has been substantial collateral damage from this case.  We ask

12  that Amanda not be a part of further damage and be allowed to

13  begin rebuilding her life under the direction of the court.

14  Thank you, Your Honor, for this time.

15          THE COURT:  Thank you, Mr. Gunn.

16          MR. NELSON:  Any other witnesses?

17          MS. PATRICIA JACKSON:  My name is Patricia Jackson.  I

18  just want to speak about the relationship that Amanda and I

19  had.  I met Amanda at Redeemer Presbyterian Church.  We went to

20  Sunday School together, church together.  I began discipling

21  Amanda.  We met at (unintelligible) and went through the basic

22  tenants of faith.  After that I took her to Greenville, South

23  Carolina to a conference put on my Beth Moore.  After the

24  conference we came -- we would meet at my house and watch these

25  videos together.

1      There was a day where after the video Amanda confided

2  in me that she was afraid of her husband.  She said he had told

3  her that people were shooting at him and trying to kill him.

4  Their whole family was in danger.  She told me that he said the

5  only way he could appease them was to prostitute herself.  At

6  that time she had told me this in confidence.  I begged her to

7  go to the police with me, but she said no and I understand why

8  now.

9      Amanda has always been a wonderful mom.  We used to go

10  to the park together and to the center and watch our children

11  play.  I realize now listening to all of this that Amanda had

12  absolutely no choice about what she did.  She was terrified of

13  her husband.  He controlled everything she did.  He wanted to

14  be the only person who supported his family.  He did some

15  things on the computer and he was always saying he was going to

16  make money but we never saw any of that happen.  Amanda got

17  several jobs and she worked hard.

18      She has loved her children and still loves her

19  children and her family very much.  I think that we need mercy

20  for Amanda.  She's been punished enough through all this done

21  to her and the time spent in prison.  I would just ask for

22  mercy from the Court.  Thank you.

23      MS. GAIL PENDERGRAST:  My name is Gail Pendergrast and

24  I met Amanda online about a year and a half before Amanda

25  became the massage therapist at our office, Aiken Augusta

1    Holistic Health.  The connection was that I for several years

2    have done work with human sex trafficking with an organization

3    here locally and doing rescue work out of Out of Darkness in

4    Atlanta.

5            Someone had seen Amanda's post around Master's week

6    saying, "Human sex trafficking is real.  I was trafficked at

7    one point."  So we connected at that point.  I had asked her if

8    she wanted to share maybe to make some validity for some other

9    organizations and she wasn't ready and then she went to massage

10   therapy school.  We were looking for someone for our office and

11   she was recommended to us by the director of the massage

12   therapy school.  She came and was with us about two years.

13           I cannot say anything negative about anything she did

14   at our office.  She was loved by all of the clients.  She was

15   on time.  She took care of them.  Her kids sometimes would come

16   with her and her words always as everybody has already said

17   were all about -- she was all about her kids, and when I got

18   that call from Amanda in March -- I guess it was last year; I

19   don't know -- and things became clear what was going on and she

20   became clear of the deception that she had been under, there

21   are no words, and having worked with victims, there is no

22   way -- there is no way they can speak up.  They're bound, and I

23   just plead to Amanda has suffered so much and I hope we -- I

24   hope the Court will look at all of the suffering she's done as

25   a victim and all the inability to think clearly when you're the

1  victim that none of us -- none of us who haven't walked in her

2  shoes can understand.  Thank you.

3          MR. NELSON:  Judge, there's been a number of letters

4  entered into the case, too.  I have a last submission.

5          THE COURT:  Okay.  I have read what you've submitted

6  so far.

7          MR. NELSON:  Judge, if I could hand this up as well.

8  This is a letter from Major Durden at the Jefferson County

9  Jail.

10          THE COURT:  Give me a moment.

11          MR. NELSON:  Yes, Judge.  Thank you, Judge.

12          THE COURT:  Take your time, Ms. Gunn.

13          THE DEFENDANT:  I want to start by thanking Your Honor

14  for allowing me to speak today.  I wanted to start by saying

15  I'm sorry to my daughter and I want to beg for her forgiveness.

16  I was supposed to be her protector, and I failed her.  I should

17  have seen all the signs, and it is my fault for allowing that

18  monster into our lives.

19          There is nothing that I wouldn't do for my children.

20  I love them more than anything.  I believe that everyone here

21  would agree that I'm a good mom, and I think they would agree

22  also that I have the most amazing kids in the world and that

23  because of how I raised them I was willing to go through all of

24  the years of abuse and torture as long as they were safe and I

25  was prepared to do that until they were grown and were able to

1    get out on their own.

2          I attempted suicide in September thinking that it was
3    the only way to keep them safe.  I thought if I removed myself
4    from the equation that it would all end.  I was in ICU for a
5    week and the doctor said that it was a miracle that there was
6    no damage.

7          Your Honor, I want what's best for my children.  I
8    have agreed to sign over rights to my daughter to my sister
9    because I do believe it's the best thing for her and what she
10   wants and it will help her heal.  I want more than anything for
11   a chance to rebuild the relationship with my daughter even
12   though I know it will take her time.  I want to do what I can
13   to bring her happiness even if that means staying away until
14   the day that she's ready.  I never want her to feel forced for
15   anything.

16         I also want to be given the chance to rebuild the
17   relationship with my son.  He's gone through so -- he's gone
18   through so much with losing his family.  He feels helpless and
19   he misses me.  I beg Your Honor to please give me the chance to
20   be the mother that he needs.

21         I remember after my ex was arrested my daughter was so
22   happy.  We were in Walmart one time and being a teenager in the
23   TikTok world she never wanted to hold my hand or anything like
24   that, but at that moment she did, and that's something I will
25   never forget, and my family needs more memories like that.

1          So many people have been affected because of this.  I

2    want to say I'm sorry to my family for being blinded by my

3    trauma for so many years and allowing it to come between our

4    family.  I can't thank you enough for taking care of my

5    children when I can't, and I want to be able to rebuild our

6    relationships to what they were before, and I pray that I have

7    that chance.  I want to prove to myself, my children, and my

8    family that I could be the person I was before.

9          I want to rebuild my future.  I now know that it will

10   take time.  Lots of things will be said against me to fail:

11   Being a felon, sex offender, and still dealing with trauma.

12   Nothing will stop me from working hard, rebuilding my family,

13   and living God's plan for me.  I have a place to live and an

14   amazing support system as you can see, Your Honor.  For a long

15   time I prayed to be rescued.  I couldn't rescue myself because

16   I was constantly terrified, and God answered that prayer of

17   February of 2020 when Tripp Godbee knocked on my door, and I

18   just want to say thank you to him and his team because you

19   saved us.  I have no doubt that I would not be here and Lord

20   knows what would have happened to my kids if he hadn't shown up

21   that day.

22         I also want to say thank you to Tara Lyons for all of

23   her hard work and dedication for keeping my children safe and

24   keeping them from harm.  I will never forget anything that

25   y'all have done for my family.  You both were a Godsend.

1          I know God allows things to happen for a reason, and I

2     believe that the things that I went through happened for a

3     purpose.  Your Honor, I want to share my story with others and,

4     hopefully, I can save them from making the same mistakes I did

5     and show them how God got me through everything.  Mark 4:39

6     says, "Fully awake he rebuked the storm and shouted to the sea,

7     hush.  Calm down.  All at once the wind stopped howling and the

8     water became perfectly calm."

9          Your Honor, I know I should have known what was

10    happening in my own home.  No one can put more blame on me than

11    I do myself.  I pray and beg that you'll have mercy on me, Your

12    Honor, and bring the calmness to my family that we so

13    desperately need.

14          THE COURT:  Thank you.

15          Anything else, Mr. Nelson?

16          MR. NELSON:  No, Judge.

17          THE COURT:  All right.  If you want to have a seat

18    with Ms. Gunn, then I'll turn the floor over to Ms. Lyons to

19    hear what the government has to say today.

20          MS. LYONS:  Your Honor, before I make my closing

21    statements to the Court, the minor victim would like to make a

22    very brief statement.

23          THE COURT:  Very well.  You may -- are you more

24    comfortable right there?

25          MS. LYONS:  Yes, she'd like to stay.

1          THE COURT:  That's fine.

2          THE MINOR VICTIM:  I thought this was going to be the

3    easier of the two letters I wrote.  It turned out to be the

4    most difficult because there are two sides to how I feel and

5    they contradict each other.  I feel that I was a child and I

6    was supposed to be protected, but at the same time I understand

7    that you were also a victim in this.  You were scared.  You

8    were my mom.  I loved you no matter what happened, and if I am

9    being completely honest, I still do which is hard for me.

10         I know you feel bad for what happened, but I also know

11   you should have protected me and you didn't.  You messed up.

12   You made mistakes, but I do -- but I think you need to know

13   that those mistakes took my childhood from me.  I know that if

14   Peyton never came into our lives that things would have been

15   very different and better.  Without him I believe you would

16   have been an amazing mom, and I know you tried your best.  You

17   did the best with the situation we had, and I know you feel

18   remorse for your actions, and I understand feeling scared, and

19   I understand not having options.

20         I ask the Court that there be as much leniency as

21   possible.  I do believe that my brother deserves to have a mom.

22   I would one day like to have a relationship with her again and

23   I forgive you.  Thank you.

24         THE COURT:  Whenever you're ready.

25         MS. LYONS:  Your Honor, I am going to go to the

24

1    podium, if that's okay.

2          THE COURT:  Sure.

3          MS. LYONS:  Thank you.  Your Honor, I will have been a

4    lawyer for 23 years this year and in my 23 years it is very

5    fair to say this is one of the two most impactful cases of my

6    career -- of my life.  I say that because this case actually

7    gives me hope moving forward.  This child -- this former victim

8    in this case -- has given me hope.  Her voice and fighting for

9    her best interest on behalf of the United States, I have tried

10   to balance that throughout this case, Your Honor, and it's only

11   in her best interest that I make the following comments.

12         When I heard Mr. Nelson speak about healing I felt

13   perhaps he had been looking over my back as I wrote my notes

14   because I do believe that's what this case is about.  In

15   February of 2020 when this investigation began Special Agent

16   Godbee of the FBI offered Ms. Gunn help and she didn't take it.

17   Special Agent Godbee asked Ms. Gunn to tell the truth about

18   things that just didn't seem to be adding up, and Ms. Gunn's

19   own family members encouraged her to tell the truth to the FBI.

20   I myself even sat in a room with Ms. Gunn and asked her to tell

21   the truth so we could get to the bottom of this story.  Over

22   the course of the next year and several months we were only

23   able to pull small tidbits.  I even admit to this Court a very

24   poor moment where I lost my temper with Ms. Gunn.  I told her

25   she had three chances to tell me the truth and when she didn't

1    I told her I would see her in jail and then I did.

2           As we reached trial I think Ms. Gunn began to see the

3    impact of this case on her daughter.  The idea of her daughter

4    having to testify in this courtroom did mean something to

5    Ms. Gunn.  We met with Mr. Nelson and Ms. Gunn and we talked

6    about her daughter.  We talked about how her daughter was

7    healing and how her daughter was not healing.  We talked about

8    whether there was ever any chance of a future relationship

9    between mother and daughter.

10          I spoke to Ms. Gunn about my own daughter.  And that's

11   when Ms. Gunn thought about signing a plea agreement.  She

12   agreed to testify and in exchange the government agreed to

13   recommend the mandatory minimum of 15 years.  Your Honor sat

14   through that trial and heard her testimony.  Your Honor had the

15   best seat in this courtroom in order to judge her credibility,

16   her body language, and her demeanor.

17          After her testimony the government filed a motion

18   under Rule 5K1.1 for substantial assistance.  In trying to look

19   back to November in that trial and evaluate Ms. Gunn's

20   testimony, the government believes she was about 75 percent

21   honest.  The parts that she was not honest about, I'm not sure

22   if that's because she doesn't want to admit in front of her

23   family and friends all of those things that she witnessed or

24   maybe it's just simply because she can't admit it to herself.

25          So the Court may be asking why would the government be

1   willing to offer the mandatory minimum of 15 years.

2           THE COURT:  I am.  I am.

3           MS. LYONS:  So the United States did this because we

4   saw the tattoos on her body placed there by Mr. Peyton Gunn.

5   We saw the emails sent by Mr. Gunn to Ms. Gunn in the name of

6   the Order, but at the same time as a mother and a prosecutor I

7   saw a mother who closed her eyes and ears to the horrors that

8   were happening in her household to her child.

9           Why the 15 years?  Because the government does

10  understand that it is not always easy for a battered woman to

11  leave a relationship even when they have a supportive family.

12  Instead, she allowed her child to carry a burden that was far

13  too heavy for that child to carry.

14          Again, why offer the 15 years?  Because as a mother

15  and as a prosecutor I can easily say what I would have done in

16  the situation.  I just can't tell you why she did what she did

17  in the situation, Your Honor.

18          And, finally, why offer the 15 years?  Because my job

19  at the end of the day is to do what's in the best interest of

20  my victim and in discussing potential sentences and plea

21  agreements with my minor victim, the term of 15 years was

22  discussed.  In the words of a child, it sounded okay.  It

23  sounded like a lot.  It sounded like enough.  And so that's who

24  I fight for when I stand here, Your Honor.

25          Your Honor, you heard about the burden that this child

1   carried when she testified.  You heard it from her voice.

2   During the sentencings today you have heard through her letters

3   and through her voice her path towards healing.  I would like

4   to tell you what I have heard through her voice since February

5   of 2020.

6           I have heard a voice discuss her mother's behavior in

7   denial.  I have heard her discuss her mother in anger, in

8   sadness, and I have heard that voice change to understanding,

9   and now to some semblance of forgiveness, but most of all she

10  never denies that Amanda is her mother and that will never

11  change.  Today is the first time I have ever seen this child

12  cry.  We kind of have a joke that I'm a huggy, teary one and it

13  was very important to her that she not cry when she was in this

14  courtroom, not cry on that stand, but she's healed, Your Honor.

15  She's moved forward, and so on behalf of a healing victim I

16  will close with simply what she said to Special Agent Godbee

17  and I during the break today when we talked to her about what

18  she wanted to ask you for, Your Honor.  She doesn't know what

19  the right number is, but she trusts that you do.  Thank you.

20          THE COURT:  Before you leave the lecturn, I have

21  questions --

22          MS. LYONS:  Yes, sir.

23          THE COURT:  -- that you are asking me to depart from

24  the guideline range and at this point you're the only person

25  that I can ask these questions.  I will admit to you and to

1    everyone in this courtroom that in the 14 years that I have sat

2    in this chair this is the most challenging sentencing I have

3    ever faced.  Mr. Nelson talked about the impact of this case on

4    him.  This case has impacted me.  That was the most difficult

5    trial as a lawyer or judge I have ever experienced.  I will

6    tell you and I will tell this family that there were moments

7    where I felt physically sick on this bench, and I have thought

8    since that trial about this day and this moment.

9            In most sentencings -- almost all -- my questions are

10    answered by the Presentence Report and in those where I've had

11    the ability to sit through a trial, the trial has filled in the

12    blanks to the Presentence Report.  I don't have that here.

13    That's what makes this so challenging.  I heard -- and I

14    listened carefully to the allocution and you've been in front

15    of me enough to know that occasionally I will ask a defendant

16    during their allocution a question or two, but the allocution

17    is the defendant's statement to the Court, and while the law

18    gives me some leeway, it is an allocution and not an

19    interrogation, and so today I listened carefully to Ms. Gunn's

20    allocution and did not engage in any interrogation at all

21    because I thought it was more important for me to just listen

22    and not be thinking about questions, but to listen and watch

23    her demeanor and listen to her statement.

24            I heard a statement toward the end that said, "I

25    should have known what was happening in my home," and I must

1    admit that that statement set me back a bit.  You know, I've

2    looked at the -- gone through this Presentence Report many

3    times which was very thorough and I looked at paragraph 12.

4    "Amanda Gunn stated that while she felt like Michael Peyton

5    Gunn and the minor victim's behavior with each other was odd,

6    she did not know that the minor victim was being abused by

7    Michael Peyton Gunn.  Amanda Gunn further stated that after

8    Michael Peyton Gunn had been arrested for the instant offenses

9    she visited him in jail and after that visit began to believe

10   that the minor victim had been abused by Michael Peyton Gunn."

11       Okay.  That is somewhat consistent with what she said

12   today in the allocution, but then I see other paragraphs --

13   paragraph 15.

14       And to the minor victim, I know you're having to

15   listen to this and I apologize.  I sincerely apologize, but in

16   paragraph 15, "The minor victim stated that she was unsure if

17   Amanda Gunn knew that Michael Peyton Gunn was taking nude

18   photographs of the minor victim but recalled that Amanda Gunn

19   was in the living room or her bedroom when the pictures were

20   being taken."

21       Seventeen: "The minor victim recalled overhearing a

22   conversation between Amanda Gunn and Michael Peyton Gunn during

23   which the minor victim heard Amanda Gunn say that she did not

24   want to, quote, do it, end of quote, and that he, Michael

25   Peyton Gunn, could have the minor victim do it.  The minor

1   victim specifically stated that do it meant to have sex with

2   men for money.  The minor victim noted that shortly after the

3   conversation she was made to have sex with several men in a

4   24-hour period at their residence."

5         Nineteen:  "The minor victim advised that prior to

6   their move to the Nicklaus Court residence Amanda performed sex

7   on Michael Peyton Gunn in the presence of the minor victim and

8   Amanda Gunn stated that the minor victim needed to learn how to

9   perform sex."

10        I am going to stop there for the benefit of the minor

11  victim.  I do apologize again, but that is simply -- and these

12  facts have not been disputed.  They've been adopted by this

13  court.  That is simply not consistent with "I should have known

14  what was happening in my home."

15        Now, again, I acknowledge that Michael Peyton Gunn was

16  an animal.  I saw in this courtroom during that trial pure

17  evil.  I saw it today when I sentenced him.  And I

18  understand -- while I cannot completely understand, let me say,

19  there is no way that I can understand what Ms. Gunn was going

20  through in that household.  I am not sure even my imagination

21  can take me there, but when you're asking for a significant

22  variance these are facts that I have to look at.  That's an

23  inconsistency that troubles me greatly.  Do you have a

24  response?

25        MS. LYONS:  I beg the Court's indulgence before I say

1    something, Your Honor.  I just wanted to make sure that she

2    knew what I was going to say before I said it.

3                THE COURT:  Okay.

4                MS. LYONS:  Your Honor, it bothers me, too.  I heard

5    Ms. Gunn when she said it.  I wrote it down.  I think since the

6    time we've interviewed Ms. Gunn the number of times we've

7    interviewed her I found her to be inconsistent, but as Your

8    Honor probably understands sometimes your best option is the

9    worst option you have on the plate and consistently through

10   this case my dedication, my oath has been to that victim.  As I

11   said earlier to you, I thought we heard 75 percent of the truth

12   on the stand.  So if Your Honor is interrogating the government

13   about what the truth in these statements is, the truth is that

14   Amanda Gunn was in that house; she was in the other bedrooms

15   while her daughter was being sexually abused.

16               THE COURT:  And tortured.

17               MS. LYONS:  And tortured.

18               THE COURT:  In a way that I know --

19               MS. LYONS:  Correct.

20               THE COURT:  -- had to be heard.

21               MS. LYONS:  She may not have known photos were being

22   taken because never had a discussion with the minor victim

23   where we could show that it was known photographs were being

24   taken; however, the sexual abuse took place in locations where

25   it's impossible that Ms. Gunn didn't know.  So the torture, the

1    sexual abuse in the house from home to home to residence, as I

2    mildly put in my statements to Your Honor, whether or not

3    Ms. Gunn doesn't want to admit that additional 25 percent or

4    just can't live with herself to admit that 25 percent is

5    something she has to deal with.

6         I felt and I still feel that what I owe this young

7    lady moving forward that I'm doing the right thing and as

8    unfair as it is, I knew walking in here and I had to explain to

9    the family that you didn't have to follow my recommendation;

10   that you were the judge.  I gave Ms. Gunn every chance when I

11   put her on the stand to take -- to tell 100 percent of the

12   truth.  I did.  She's had her own fate in her own hands, Your

13   Honor.

14        THE COURT:  And this is unusual.  You and I are,

15   basically, engaged in this conversation in a public courtroom

16   in front of everyone, but this is the only opportunity to have

17   this.

18        MS. LYONS:  Yes.

19        THE COURT:  And, again, I've listened.  I listened to

20   Ms. Gunn's testimony in trial, and to be very candid it was not

21   compelling to me at all.  The testimony that was compelling in

22   that trial was the minor victim.

23        MS. LYONS:  Your Honor, I will go a step further --

24   and I apologize.  I say with all due respect to Mr. Nelson who

25   has handled this case with grace and respect, this is a

1    horrible case, and he's fought tremendously for Ms. Gunn.  I

2    think what Ms. Gunn is -- she said, "I think all of the people

3    in this room would say I'm a good mom."  I don't.  That was

4    what I wrote.

5            THE COURT:  Well, I don't -- I can't agree with that.

6            MS. LYONS:  No.  Yeah, I don't.

7            I don't think you've been a good mom.

8            I don't, but that's not my job here today and I've

9    done my best to come to a resolution for this young lady and

10   this family to take the monster out of the house.  At the end

11   of the day Special Agent Godbee and I discussed that as long as

12   these two children were safe, it didn't matter how many counts

13   we lost or how many counts we won, and we believe they're safe.

14   They're safe with their grandparents.  They're safe with their

15   uncle and aunt.  I don't know if it matters if Ms. Gunn gets 15

16   years or 230 months.  They're safe.

17           I'm sorry.  I have a lot of personal emotion and

18   probably a lot of anger about it.

19           THE COURT:  When you closed your 5K Motion you under

20   -- it's essentially boilerplate -- the citation of authority.

21   This is the last page above your signature, and it says, "The

22   Court may depart from the guidelines," and it talks about

23   reasons that I may consider.  These are not limited.  These are

24   just simply some of the reasons.

25           The first is "The Court's evaluation of the

1   significance of usefulness of the defendant's assistance taking

2   into consideration the government's evaluation of the

3   assistance rendered."  Is your evaluation of her assistance in

4   reaching your assessment of the level of assistance -- is that

5   based upon mostly the trial testimony or is that based upon

6   other facts that you relied upon?

7          MS. LYONS:  No.  I think in drafting this, Your Honor,

8   I was thinking about the trial testimony.  At that particular

9   time when she signed the plea agreement we were heading into

10  trial and the government was most concerned with the idea that

11  the defense would blame Ms. Gunn for the photographs as being

12  kind of that empty chair defense and wanted corroboration for

13  the minor victim's testimony that it was her father doing these

14  things, not her mother, and so that would be the significance

15  of that testimony -- Ms. Gunn being able to deny the fact that

16  she was the one doing these things to her daughter.

17         THE COURT:  The second, "The truthfulness,

18  completeness and reliability of any information or testimony

19  provided by the defendant," and I -- my emphasis was on

20  completeness.  Was that a material factor in your

21  consideration?

22         MS. LYONS:  As I mentioned earlier, Your Honor, in my

23  discussions with Special Agent Godbee and others who sat

24  through the trial, I felt that perhaps she had been 70 to

25  75 percent complete or truthful in her testimony.

1          THE COURT:  And, finally, "The timeliness of the

2   defendant's assistance."  My understanding -- and you correct

3   me if I am wrong and I know you will -- is that, essentially,

4   that came to fruition at the last minute in the week before

5   trial.

6          MS. LYONS:  Correct.  I believe it was the day of the

7   pretrial conference.

8          THE COURT:  Okay.  Anything else you'd like to offer

9   to me that I haven't covered in this interrogation?

10          MS. LYONS:  No, Your Honor.  I appreciate and welcome

11   the questions.

12          THE COURT:  All right.  Mr. Nelson, if there is

13   anything you'd like to offer as a result of my discussions with

14   the government, I will certainly afford you that opportunity.

15          MR. NELSON:  Thank you, Judge.  It can be kind of

16   dangerous, to be honest with you.

17          THE COURT:  I understand.  I told you this is the most

18   challenging sentencing I've ever had.

19          MR. NELSON:  I think normally I'm supposed to argue.

20   I am supposed to take a side and get you to agree with me.  The

21   nature of this proceeding lends me more towards me telling you

22   my opinion and you agree with it or don't, Judge.

23          THE COURT:  That's fine.

24          MR. NELSON:  My representation started as a target

25   letter.  I got a call asking me if I could assist in advising

1   someone who had received a target letter in an investigation

2   because they believe that person was not being truthful.  There

3   was already an indictment and at this point I assumed my

4   position was to just tell the person "Here's what you're

5   required to do under law and here's the penalty if you don't

6   abide by that."  Over the next couple of months it continued,

7   and it ended up in an indictment against the person who I had

8   only been assigned to represent in a target letter and to the

9   case that we find ourselves in today.

10          Several interrogations.  We sat with law enforcement

11  and Ms. Lyons -- if I misquote -- four to five times, not more

12  than that, in an attempt to square the testimony of my client

13  and the other witnesses in the case.  I think it would be

14  remiss if I didn't point out a couple of things in respect to

15  the completeness or the truthfulness.

16          First, the Court received a letter from the counselor

17  for Ms. Gunn that indicates she does suffer from PTSD and I

18  mentioned in my comments that I believe she's coming out of a

19  fog.  I think that happened today -- continuing, Judge.  It is

20  really hard for me to put myself in a position -- any of us to

21  put ourselves in that position -- and I am not asking you to

22  suspend your thoughts on how humans interact with one another,

23  but I do think there is some inability to both communicate and

24  understand the things that are happening to you when you're put

25  in that position.

1          Paragraph 80 of the Presentence Report cites

2     consistent with what Amanda Gunn has told me and what I believe

3     the minor victim has testified to:  A lot of this activity took

4     place while they were drugged.  It's always occurred to me that

5     it would make complete sense that somebody was in a state of

6     intoxication and not able to recall things that happened.  I am

7     not pointing that to mean that that happened every time, Judge,

8     but I think that needs to be considered.  The testimony ---

9          THE COURT:  Well, let me ask you, though, Mr. Nelson,

10    do you believe particularly when the torture was taking place

11    with this child, is it her contention that she was either on

12    drugs or intoxicated every time?

13          MR. NELSON:  No.  No, Judge.

14          THE COURT:  I just think, I mean, that's ---

15          MR. NELSON:  No, no.  That's an easy answer.  I think

16    that's an easy answer.  I think no, but I don't know that the

17    intoxication or drugs or those things were the only thing that

18    would have stood as a barrier to what we would think of as

19    knowledge or the ability to be aware of what's happening.

20          Negotiations throughout this process went on and on

21    about plea arrangements.  Legally when I look at what the

22    criminal conduct that's been charged against Ms. Gunn there are

23    a slew of lesser included offenses that I believe could have

24    satisfied the court.  I think the punishment for Ms. Gunn

25    waiting until the eve of trial is the harshness of the plea

1   which she took.  Quite frankly, at the beginning of this case

2   when I only had a target letter and she admitted that "I was

3   not truthful in my statements and here is the actual truth," it

4   very well could have been a perjury charge and we would have

5   handled that at that level.  So I do think there is a built-in

6   punishment for waiting time to get there.

7           Judge, I can't tell you why or the truthfulness of the

8   statements.  I personally have seen the evidence, the discovery

9   that's been provided by the court.  I've had the same

10  questions, but one thing that the discovery doesn't include

11  which I do think is substantiated by the record is the intense

12  sexual, emotional trauma experienced by Ms. Gunn.  This case

13  starts -- the case that we're here starts with the minor

14  victim's abuse, but the actual factual underpinnings of this

15  case started in 2010.

16          THE COURT:  Right.

17          MR. NELSON:  And so the amount of suffering and

18  position that Ms. Gunn found herself I think plays a role in

19  this.  The testimony that she gave at trial -- I'm letting you

20  inside of our trial preparation.  I struggled greatly with

21  whether or not if we were going to try the case whether or not

22  Ms. Gunn would testify on her own behalf.  She can only answer

23  the questions that are asked.  The government's questions of

24  Ms. Gunn would have been significantly different if she was

25  still subject to prosecution.  So there certainly could have

1   been questions that would have brought out the inconsistencies,

2   but at trial the testimony of Ms. Gunn fit into the

3   government's plan for prosecution of Peyton.

4          THE COURT:  Sure and I understand.

5          MR. NELSON:  So to the extent that there would be more

6   information there, there is probably more information there

7   today from all the witnesses that we don't have.  So I don't

8   want to say that it's wrong to say that there may have been

9   some withholding because of the things that I've talked about,

10  but I do think in my opinion she answered the questions that

11  were asked, and, Judge, I do think it's -- I do think her

12  testimony was important to the prosecution of Peyton Gunn.

13         I will tell you at the beginning of the case I thought

14  we don't need Amanda Gunn's testimony to convict Peyton Gunn,

15  but hearing it and understanding that he was grooming the minor

16  victim in the same habit, in the same path that he completed on

17  Ms. Gunn in my opinion makes it a much easier for the

18  correlation for the jury to determine that that is the criminal

19  conduct that took place, and so to the extent that it may not

20  necessarily be an eyewitness testimony or it may not be a --

21  plead the prima facie case of the charges against Peyton Gunn,

22  I do believe that it's certainly assisted in the prosecution.

23         It's hard to stand up, Judge, and paint a picture of

24  someone else's mind.

25         THE COURT:  It is.

1          MR. NELSON:  And I'm hesitant to tell you that even

2   Amanda Gunn could do it today.  I don't know that she can do it

3   ten years from now.  I really don't.  It's easy for me to

4   continually say that I can't put myself in those shoes, but

5   it's not just a matter of the types of things that we interact

6   with in our lives that put us in the mindset of how we interact

7   with the world.  It's something so heinous, so designed to

8   cause the harm and facilitate this system.  It is calculated.

9   It was premeditated.  It worked.  It worked.  Peyton Gunn was

10  successful.  Amanda Gunn was a part of that system.  Trying to

11  hold her out as a normal human being after going through that

12  system I would submit is problematic.  I don't think justice

13  would serve her be treated the same as we would someone else.

14  Thank You, Judge.

15          THE COURT:  Any final word from the government?

16          MS. LYONS:  Nothing further, Your Honor.  Thank you.

17          THE COURT:  I want to take about five minutes and I

18  want to go over a couple of things with my probation officer.

19  We'll be in recess.  I'll be right back.

20      (A break is taken.)

21          THE COURT:  If you would return to the lecturn,

22  please.  The Court is now ready to pronounce and impose the

23  sentence in this case.  I have now listened to Ms. Gunn and her

24  counsel.  I have heard from the minor victim in this case.  I

25  have heard from the custodian for the minor victim.  I have

1  also heard from a number of friends, family members,

2  supporters, both by live testimony and by letters of support.

3  I have carefully reviewed the Presentence Report.  In arriving

4  at the sentence that this court will now impose I have

5  carefully considered the 18 U.S.C. § 3553(a) sentencing

6  factors.

7        Pursuant to the Sentencing Reform Act of 1984 it is

8  the judgment of this court that the defendant, Amanda Gunn, is

9  hereby committed to the custody of the Bureau of Prisons to be

10  imprisoned for a term of 235 months.  This court has found no

11  reason this afternoon to depart from the sentence called for by

12  application of the advisory guidelines inasmuch as the facts as

13  found are of the kind contemplated by the Sentencing

14  Commission.  The Court recognizes that this sentence or that

15  the range in this case is significant.  As a result the Court

16  is required to state its reasons for sentencing at the low end

17  of the guideline range.

18        The Court finds that the circumstances, the incredible

19  abuse by Ms. Gunn by Michael Peyton Gunn suggests a low-end

20  sentence.  Certainly, the government has filed a 5K1 Motion in

21  this case, and, in addition, through the plea agreement has

22  recommended actually a departure in this case.  While the Court

23  has found no basis for a departure in this case, certainly the

24  government's actions weigh toward a bottom of the guideline

25  sentence result.  The Court is mindful of the wishes of the

1   minor victim in this case and has listened very carefully to

2   those wishes.  Again, those wishes weigh toward a bottom of the

3   guideline sentence.  Those factors have resulted in the Court

4   sentencing at the very bottom of the Sentencing Guideline range

5   in this case.

6           Restitution is due in the amount of $800,000 to the

7   minor victim in this case.  However, the economic circumstances

8   of Ms. Gunn do not allow for the payment of the full amount of

9   restitution ordered under any reasonable schedule of payments

10  now or in the foreseeable future.  Pursuant to

11  18 U.S.C. § 3664(f)(3)(B) nominal payments of either quarterly

12  installments of a minimum of $25 if working non-UNICOR or a

13  minimum of 50 percent of monthly earnings if working UNICOR

14  shall be made.  If ever released from imprisonment and while on

15  supervised release nominal payments of a minimum of $500 per

16  month shall be made.  Payments shall be made payable to the

17  Clerk, United States District Court, for disbursement to the

18  victim.  The Court has determined that Ms. Gunn does not have

19  the ability to pay interest; therefore, I order that the

20  interest requirement is waived.

21          After considering the 5E1.2(d) factors and Ms. Gunn's

22  restitution obligation, I hereby determine that she does not

23  have the ability to pay a fine.  No fine is imposed.  I do

24  order that she shall pay to the United States a special

25  assessment of $100 which shall be due immediately.  I have

1    determined that she is indigent and does not have the ability

2    to pay the special assessment under the Justice for Victims of

3    Trafficking Act of 2015 and it is ordered that the special

4    assessment is waived.

5         Pursuant to the plea agreement Ms. Gunn shall forfeit

6    her interest in any property involved in the instant offense.

7         When she is released from imprisonment Ms. Gunn shall

8    be placed on supervised release for a term of 20 years.  While

9    on supervised release she shall comply with the standard

10   conditions of supervision adopted by this court and the

11   mandatory conditions required by 18 U.S.C. § 3583 which will

12   include, but not be limited to, urine testing, a prohibition

13   against possession of any firearm or other dangerous weapon and

14   a prohibition against the violation of any law.  Further, she

15   shall cooperate in the collection of a DNA sample as directed

16   by the probation officer pursuant to 18 U.S.C. § 3583.

17        As a mandatory condition of her supervision Ms. Gunn

18   must comply with the requirements of the Sex Offender

19   Registration Notification Act as directed by the probation

20   officer, the Bureau of Prisons or any state sex offender

21   registration agency in which she resides, works, is a student

22   or was convicted of a qualifying offense.

23        While on supervised release Ms. Gunn shall comply with

24   certain special conditions.  I have considered the

25   18 U.S.C. § 3553 and 3583 factors and relevant policy

1   statements issued by the Sentencing Commission and I have

2   determined that these special conditions involve no greater

3   deprivation of liberty than is reasonably necessary to achieve

4   the purposes of sentencing.  The following special conditions

5   are imposed.

6        Ms. Gunn must submit to substance abuse testing to

7   determine if she has used a prohibited substance and she must

8   not attempt to obstruct or tamper with any testing methods.

9   She must provide the probation officer with access to any

10  requested financial information and authorize the release of

11  any financial information.  The probation office may share

12  financial information with the U.S. Attorney's Office.  She

13  must pay the financial penalty in accordance with the schedule

14  of payments sheet of the judgment.  She must notify the court

15  of any changes in her economic circumstances that might affect

16  her ability to pay the financial penalty.

17       She must submit her person, property, house,

18  residence, office, vehicle, papers, computers, other

19  electronic-communications or data-storage devices or media to a

20  search conducted by a U.S. Probation Officer.  Failure to

21  submit to a search may be grounds for revocation of release.

22  She must warn any other occupants that the premises may be

23  subject to searches pursuant to this condition.  The probation

24  officer may conduct a search under this condition only when

25  reasonable suspicion exists that Ms. Gunn has violated a

1    condition of her supervision and that the areas to be searched

2    contain evidence of the violation.  Any search must be

3    conducted at a reasonable time and in a reasonable manner.

4         She must participate in a sex offense specific

5    treatment program and follow the rules and regulations of the

6    program.  The probation officer will supervise her

7    participation in the program.  She must pay the cost of

8    treatment in an amount to be determined by the probation

9    officer based on her ability to pay or the availability of

10   third-party payment.

11        She must submit to periodic polygraph testing at the

12   discretion of the probation officer as a means to ensure that

13   she is in compliance with the requirements of her supervision

14   or treatment program.

15        She must not have direct contact with any child that

16   she knows or reasonably should know to be under the age of 18

17   including her own children without the permission of her

18   probation officer.  If she does have any direct contact with

19   any child that she knows or reasonably should know to be under

20   the age of 18 including her own children without the permission

21   of her probation officer she must report this contact to the

22   probation officer within 24 hours.  Direct contact includes

23   written communication, in-person communication or physical

24   contact.  Direct contact does not include incidental contact

25   during ordinary daily activities in public places.

1          She must not view or possess any visual depiction
2    including any photograph, film, video, picture or computer or
3    computer-generated image or picture whether made or produced by
4    electronic, mechanical or other means, of sexually explicit
5    conduct as that is defined in 18 U.S.C. § 2256.

6          She must not go to or remain at any place where she
7    knows children under the age of 18 are likely to be including
8    parks, schools, playgrounds, and childcare facilities.

9          She must submit her computers or other
10   electronic-communications or data-storage devices or media to a
11   search.  She must warn any other people who use these computers
12   or devices capable of accessing the internet that the devices
13   may be subject to searches pursuant this the special condition.
14   A probation officer may conduct a search pursuant to this
15   condition only when reasonable suspicion exists that there is a
16   violation of a condition of supervision and that the computer
17   or device contains evidence of the violation.  Any search will
18   be conducted at a reasonable time and in a reasonable manner.

19         Ms. Gunn must comply with a curfew from 10 p.m. to
20   6 a.m. during supervision.  During this time she will remain at
21   her place of residence at all times and shall not leave except
22   when the leave is approved in advance by the probation officer.

23         I direct the probation officer to provide Ms. Gunn
24   with a written statement which sets forth all of the conditions
25   to which her term of supervised release is subject.

1          I have accepted the plea agreement because I am

2    satisfied that the agreement adequately reflects the

3    seriousness of the actual offense behavior and that accepting

4    this plea agreement will not undermine the statutory purposes

5    of sentencing.

6          In accordance with the plea agreement I order that

7    count nine of the Superceding Indictment be dismissed as to

8    Ms. Gunn.

9          I order she is remanded to the custody of the United

10   States Marshal.  I do recommend that she be assigned to the

11   Marianna, Florida FCI for purposes of her custodial sentence.

12         Pursuant to the plea agreement with limited exceptions

13   Ms. Gunn has waived all rights conferred by 18 U.S.C. § 3742 to

14   appeal this sentence.  She has also waived the right to appeal

15   the sentence on any other ground and she has waived the right

16   to attack the sentence in a post-conviction proceeding.

17         Sentence has now been pronounced by this Court.  Other

18   than any objections which have previously been stated for the

19   record, does anyone now have any objections to this Court's

20   findings of fact, its conclusions of law or to the manner in

21   which the sentence was pronounced by this Court?

22         Ms. Lyons?

23         MS. LYONS:  No objection, Your Honor.

24         THE COURT:  Mr. Nelson?

25         MR. NELSON:  No, Judge.

1          THE COURT:  All right.  We are concluded with

2     sentencing today.

3          (The hearing is concluded.)

1                        CERTIFICATE OF REPORTER

2

3

4

5        I, Lisa H. Davenport, Federal Official Reporter, in and

6   for the United States District Court for the Southern District

7   of Georgia, do hereby certify that pursuant to Section 753,

8   Title 28, United States Code that the foregoing is a true and

9   correct transcript of the stenographically-reported proceedings

10  held and that the transcript page format is in conformance with

11  the regulations of the Judicial Conference of the United

12  States.

13

14                         _____

15                         Lisa H Davenport, RPR, FCRR

16                         Federal Official Reporter

17

18

19

20

21

22

23

24

25