UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

United States of America,      )
                               )
          Plaintiff,           )
                               )
     vs.                       )    Case No. 1:20CR14
                               )
Amanda Gunn a/k/a Amanda       )
Howard,                        )
                               )
          Defendant.           )
_____)


CHANGE OF PLEA HEARING
BEFORE THE HONORABLE J. RANDAL HALL
CHIEF UNITED STATES DISTRICT COURT JUDGE
THURSDAY, NOVEMBER 4, 2021; 2:29 P.M.


FOR THE PLAINTIFF:

     Tara M. Lyons, Esquire
     U.S. Attorney's Office
     Post Office Box 2017
     Augusta, Georgia 30903
     (706)724-0517

FOR THE DEFENDANT:

     Frank Adam Nelson, Esquire
     Fleming & Nelson, LLP
     Post Office Box 2208
     Evans, Georgia 30809
     (706)664-0410

OFFICIAL COURT REPORTER:

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468

1                          INDEX

2   WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

3   Harold D. Godbee, III,

4        By Ms. Lyons          18

5

6

7

8

9

10

11

12

13                        EXHIBITS

14  NO.       IDENTIFICATION                  EVD.

15

16

17                      (None offered)

18

19

20

21

22

23

24

25

1        (Call to Order at 2:29 p.m.)

2            THE CLERK:  The court calls case number 1:20CR14.  The

3    United States of America v Amanda Gunn also known as Amanda

4    Howard.  Tara Lyons for the government.  Frank Adam Nelson for

5    the defendant.  Here for a change of plea.

6            THE COURT:  Thank you.  Good afternoon.

7            MS. LYONS:  Good afternoon, Your Honor.

8            MR. NELSON:  Good afternoon, Judge.

9            THE COURT:  Ms. Lyons, to perfect the record in this

10   case has the minor victim been notified of this hearing?

11           MS. LYONS:  Your Honor, the minor victim's guardian

12   has been notified of this hearing; however, Special Agent

13   Godbee and I met with the minor victim on two nights ago and

14   have fully discussed all options and offers that were going on

15   in this case, and she has placed in us and her guardian the

16   final decision making on any offers.  I have full faith that

17   this complies with what the minor victim would agree with in

18   this case, Your Honor.

19           THE COURT:  All right.  And through the guardian the

20   minor victim does not wish to be present; is that correct?

21           I'm sorry.  If you would stand, ma'am.  You are the

22   guardian for the minor victim in this case?

23           MRS. ASHLEY COXWELL:  Yes, sir.

24           THE COURT:  What is your name?

25           MRS. ASHLEY COXWELL:  Ashley Coxwell.

1          THE COURT:  Coxwell?

2          MRS. ASHLEY COXWELL:  Yes.

3          THE COURT:  As the guardian for the minor victim in

4    this case, do you consent that she not be present today?  Is it

5    her desire not to be present for this hearing?

6          MRS. ASHLEY COXWELL:  Yes, sir.

7          THE COURT:  Okay.  Thank you.

8          All right.  And you are Amanda Gunn also known as

9    Amanda Howard; is that correct?

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  Now I believe you now go by Amanda Howard;

12   is that correct?

13         THE DEFENDANT:  Amanda Gunn.

14         THE COURT:  I'm sorry?

15         THE DEFENDANT:  Amanda Gunn.

16         THE COURT:  So for purposes of this hearing you wish

17   for me to refer to you as Amanda Gunn or Ms. Gunn?  Is that

18   okay?

19         THE DEFENDANT:  That's fine.

20         THE COURT:  Okay.  Ms. Gunn, I understand that you

21   have entered into a plea agreement that calls for you to come

22   into court today and to change a plea and now plead guilty to

23   count one of a superceding indictment which is the charge of

24   sex trafficking conspiracy; is that correct?

25         THE DEFENDANT:  Yes, sir.

1          THE COURT:  Has anyone threatened, pressured or forced

2     you to come into court this afternoon and change your plea to

3     guilty on this charge?

4          THE DEFENDANT:  No, sir.

5          THE COURT:  I want to make sure that you understand

6     everything that we talk about here today.  If you have any

7     problem hearing me or understanding anything that I say to you

8     or ask you, please interrupt me and let me know.  You are

9     represented by Mr. Nelson and I encourage you to rely on him

10    during this hearing; so if for some reason you feel the need to

11    speak to him or ask him a question, you go right ahead and do

12    that and don't worry about me.  Okay?

13         THE DEFENDANT:  Okay.

14         THE COURT:  All right.  With that, I am going to ask

15    you to raise your right hand and the clerk will place you under

16    oath.

17     (Amanda Gunn is duly sworn.)

18         THE CLERK:  Please state your name for the record.

19         THE DEFENDANT:  Amanda Gunn.

20         THE CLERK:  Thank you.

21         THE COURT:  Ms. Gunn, by taking that oath you've now

22    promised to the tell the truth during this afternoon's hearing.

23    If for some reason you do not, you can be prosecuted for

24    perjury and making a false statements and the statements made

25    in court can be used against you.  How old are you, Ms. Gunn?

1              THE DEFENDANT:  Thirty-five.

2              THE COURT:  Are you single or married?

3              THE DEFENDANT:  I'm single.

4              THE COURT:  Tell me about your children.  How many

5    children.  How many children do you have?  Boy, girl, ages?

6              THE DEFENDANT:  I have a 15-year-old daughter and a

7    10-year-old son.

8              THE COURT:  Okay.  What kind of work do you do?

9              THE DEFENDANT:  I was a massage therapist and also a

10   chiropractor's assistant.

11             THE COURT:  How far did you go in school?

12             THE DEFENDANT:  High school and then I did my

13   schooling to be in massage therapy.

14             THE COURT:  Can you read and write?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Are you under the influence of any alcohol

17   or drugs today?

18             THE DEFENDANT:  No, sir.

19             THE COURT:  Are you currently being treated for any

20   type of mental illness?

21             THE DEFENDANT:  No, sir.

22             THE COURT:  Do you understand where you are and why

23   you're here this afternoon?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Now, Ms. Gunn, as you know the grand jury

1    has returned an indictment.  In this case it is a superceding

2    indictment.  I have walked out here without a copy of the

3    superceding indictment.

4         Do you have it right there?  Thanks.

5         All right.  So you are charged in count one with sex

6    trafficking conspiracy.  It goes on to say that beginning at a

7    time unknown to the grand jury, but at least from in or about

8    December 2018 and continuing through in or about November of

9    2019, in Columbia County, which is within this District and

10   also in the District of South Carolina, you, along with

11   co-defendant Michael Peyton Gunn, being aided and abetted by

12   each other and others, known and unknown, conspired with each

13   other and others, known and unknown, to knowingly in and

14   affecting interstate commerce recruit, entice, harbor,

15   transport, provide, obtain, advertise, and maintain Minor

16   Victim Number One, a person who had not attained the age of 18

17   years, knowing and in reckless disregard for the fact that

18   Minor Victim Number One had not attained the age of 18 years,

19   for the purpose of causing Minor Victim Number One to engage in

20   commercial sex acts and to benefit financially and by receipt

21   of things of value from participation in a venture which

22   recruited, enticed, harbored, transported, provided, obtained,

23   advertised, and maintained Minor Victim Number One who had not

24   attained the age of 18 years by causing Minor Victim Number One

25   to engage in commercial sex acts in violation of the United

1  States Code.  I further note that you are also charged in count

2  nine with obstruction of a child sex trafficking investigation.

3          Now you have previously plead not guilty to these

4  charges.  Have you seen a copy of this indictment and discussed

5  it and gone over it with your lawyer?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Have you had as much time to talk to

8  Mr. Nelson as you would like to about this charge?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  These charges.  And are you satisfied with

11  the help that you have received from him so far as your lawyer

12  in this case?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Now I note, Ms. Gunn, you previously

15  entered a plea of not guilty to both count one and count nine.

16  Under the Plea Agreement that you have confirmed it appears

17  that you now wish to change your plea on count one to guilty;

18  correct?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  Now the law says that when you enter a

21  plea of not guilty to a charge, which you have a right to do,

22  at that -- you also have a right to persist or stand pat on

23  that plea and in doing so proceed to have a jury trial on the

24  charge.  By pleading guilty to count one today you will be

25  giving up the right to have a jury trial on this charge.

 1   Before I can allow you to do that I need to explain to you what
 2   a trial would look like, what your rights would be.  So let me
 3   begin.
 4          The law says you would have a right to a speedy and
 5   public jury trial on this charge.  You would have the right to
 6   be present for the trial and every other proceeding related to
 7   your case.  At trial you and your lawyer would participate in
 8   selecting the jury.  You could use what the law calls
 9   preemptory challenges to challenge any potential juror from
10   serving.  Once selected the jurors would promise under oath to
11   try your case fairly and justly.
12          You would be presumed innocent as you are right now.
13   That presumption would remain with you through trial.  That
14   means the government would be required to prove guilt beyond a
15   reasonable doubt.  Any verdict by the jury would have to be
16   unanimous.  You would have a right to see and to hear and to
17   cross examine any witnesses that the government might call to
18   trial.  Since the government has the burden of proof and not
19   you, you would not be required to put forth a defense, but if
20   you chose to, which you would have the right to do, you could,
21   for example, use the court's subpoena power to bring witnesses
22   to court.
23          You could also take the stand and testify in your
24   defense with the government having the right to cross examine
25   you or you could choose not to put forth a defense and, more

1  importantly, you could choose not to testify.  If you chose

2  either one of those options nothing would be said to the jury

3  that would suggest in any way that you were guilty because of

4  your silence.  In fact, I would tell the jurors they could not

5  hold that against you.

6          You would have a right to appeal any verdict.  You

7  would have a right to have a lawyer help you with that appeal

8  and you would have a right to have a lawyer appointed and paid

9  by the Court if you could not afford to pay the lawyer's fee.

10 So by pleading guilty this afternoon to count one, Ms. Gunn,

11 you'll be giving up the jury trial that I just described and

12 related rights.  You will simply be found guilty of this charge

13 based upon your guilty plea.  There will be no trial of any

14 kind on count one.  Do you understand all of that?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  Knowing these rights now, do you wish to

17 waive or give up your right to a jury trial and plead guilty to

18 count one?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  All right.  I mentioned the Plea

21 Agreement.  Did you sign this Plea Agreement and initial the

22 pages, Ms. Gunn?

23         THE DEFENDANT:  I did.

24         THE COURT:  Did you go over it carefully with

25 Mr. Nelson before you signed it?

1    THE DEFENDANT:  Yes, sir.

2    THE COURT:  When you enter into a Plea Agreement with

3  the government you agree that all the facts that are contained

4  in the agreement are true and accurate and you agree to be

5  bound by all of the terms of the agreement.  Do you understand

6  that?

7    THE DEFENDANT:  Yes, sir.

8    THE COURT:  Does this Plea Agreement contain

9  everything you agreed to?

10    THE DEFENDANT:  Yes, sir.

11    THE COURT:  Other than the promises that the

12  government made to you in this Plea Agreement, has anyone else

13  on behalf of the government promised you anything else?

14    THE DEFENDANT:  No, sir.

15    THE COURT:  Now I am not going to go over everything

16  in the Plea Agreement, but I do want to go over a few important

17  matters.  Obviously, you are now going to change your plea and

18  plead guilty to count one in the superceding indictment.  The

19  government has agreed that at sentencing they will recommend --

20  recommend -- to the Court that you be sentenced to the

21  mandatory minimum term of 15 years of incarceration.  Remember,

22  that is a recommendation.

23    To the extent it is determined that any restitution is

24  due to the victim in this case, you agree to pay restitution

25  for the full loss caused by your conduct.  You have also agreed

1  to forfeit any interest in any property that is forfeitable in

2  this case.  At sentencing the government has agreed they will

3  ask the Court to dismiss count nine.

4  This Plea Agreement also contains an appeal waiver.

5  There are two parts to this appeal waiver.  Listen very

6  carefully.  The first part says you're waiving your right to

7  appeal your conviction and sentence directly on any ground with

8  three exceptions.  Those exceptions are you may appeal your

9  sentence if your sentence should exceed the statutory maximum

10  penalty for this charge or should your sentence exceed the

11  applicable sentencing guideline range for your case or should

12  the government appeal.

13  The second part is that you are waiving the right to

14  collaterally attack your conviction and sentence in a

15  post-conviction proceeding on any ground.  There is one

16  exception to this part of the waiver and that is you are not

17  waiving or giving up your right to base a claim on ineffective

18  assistance of counsel.  Do you understand this agreement has

19  the plea waiver -- I mean, the appeal waiver that I just

20  described?

21  THE DEFENDANT:  Yes, sir.

22  THE COURT:  Again, does this Plea Agreement contain

23  everything you agreed to?

24  THE DEFENDANT:  Yes, sir.

25  THE COURT:  All right.  Let me now go over the

1    potential penalties to you.  The law says that upon a

2    conviction of this offense you could be imprisoned for not less

3    than 15 years, not more than life.  You could be fined not more

4    than $250,000.  Following incarceration you could be placed on

5    supervised release for not less than five years or not more

6    than life.  You are subject to the forfeiture of all

7    forfeitable assets.  You are also subject to a restitution

8    order.  There are special assessments under federal law that

9    you may be required to pay.

10            You will be required to register as a sex offender

11   under the Sex Offender Registration Notification Act and

12   potentially state laws of the state where you end up living.

13   You'll also be required to pay a $100 special assessment at the

14   time of sentencing.  Do you now understand all of these

15   potential penalties?

16            THE DEFENDANT:  Yes, sir.

17            THE COURT:  Now you are in a federal court where

18   parole has been abolished.  So when you receive a prison

19   sentence -- and it will be not less than 15 years in your

20   case -- you will be required to serve that sentence in custody

21   in full with the ability, however, to earn good time credits

22   while you are in custody that could reduce the actual number of

23   days that you will serve.  Now after serving the prison

24   sentence, you'll be released from prison on to supervised

25   release.  I, again, point out there is a mandatory minimum of

1    five years of supervised release and not more than life.

2           Supervised release means that you're not in custody

3    but you're still under the court's supervision and rules.  If

4    you break those rules you can be arrested, brought back to

5    court, and if I revoke your supervised release, then you can be

6    sent back to prison to serve an additional period of time.

7           I finally note, Ms. Gunn, that this is a felony

8    conviction, and a felony conviction will deprive you of the

9    right to vote, to serve on a jury, to hold public office, and

10   to own or possess firearms or ammunition.  Do you understand

11   now the potential consequences to you of pleading guilty to

12   this charge?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  Now in terms of sentencing, let me tell

15   you how that works.  I am going to ask the probation officer

16   assigned to your case to investigate your case and then to

17   prepare a written report that will assist me with your

18   sentencing.  We call that a Presentence Investigation Report.

19   So the officer will interview you in the presence of counsel --

20   ask you a number of questions.  There will be other people

21   interviewed and then there will be records reviewed as part of

22   the complete investigation.  Once the investigation has been

23   completed, then a draft Presentence Report will be issued.

24           You will meet with Mr. Nelson and go over that draft

25   report.  I would encourage you to do so and do so carefully.

1   Why?  Because if you find that the report contains errors or

2   contains matters that you or Mr. Nelson may object to, then you

3   need to let the probation officer know and that is very

4   important.  Once the parties have had their say, then the

5   probation officer will prepare a final written report.  You

6   will, again, meet with Mr. Nelson and go over that report.

7           The final report also is delivered to me and so that's

8   the report that I use to determine what your sentence will be.

9   Once I have the final report then we will schedule sentencing.

10  You will be present for sentencing.  That is a right you have

11  and a requirement to be present for sentencing.  At that

12  hearing if there are still any outstanding objections to the

13  Presentence Report, then I will hear those objections and

14  resolve them.  Then I will offer you and Mr. Nelson the

15  opportunity to present me with anything that you think is

16  important for me to know about you:  Letters of support,

17  character witnesses, really anything that you think I need to

18  know.  Then, like every defendant who comes before this court,

19  I will give you the opportunity, because it is a right, to say

20  anything you would like to say to me.

21          Now as part of that hearing I will announce and adopt

22  the final sentencing guidelines that are applicable to your

23  case.  It should come as no surprise to you.  It will be in the

24  Presentence Report.  Nevertheless, I am required to announce

25  those and to adopt them, if you would, to guide me during

1    sentencing.  Now the guidelines are not mandatory.  They're

2    advisory, but they are very important.  I will consider them,

3    but I have three options:  I can sentence you within the range

4    of months that the guidelines suggest or I can go below the

5    range or I can go above the range.  That is a summary of how

6    you'll be sentenced.  Do you have any questions?

7                    THE DEFENDANT:  No, sir.

8                    THE COURT:  Has anyone made a promise or a prediction

9    or a prophecy that you would receive a specific sentence in

10   this case?  Now I understand the government has agreed to

11   recommend the 15 years, but has anyone promised, predicted or

12   made a prophecy that you would receive a specific sentence?

13                   THE DEFENDANT:  No, sir.

14                   THE COURT:  Okay.  Now in order to convict you of this

15   offense the government is going to have to prove or would have

16   to prove four things.  Listen very carefully.  First, that two

17   or more people in some way agreed to try to accomplish a shared

18   and unlawful plan; second, that you knew the unlawful purpose

19   of this plan and you willfully joined in it; third, that the

20   object of this unlawful plan was to recruit, entice, harbor,

21   transport, provide, obtain, maintain or solicit by any means a

22   person that you had a reasonable opportunity to observe the

23   minor recruited, enticed, harbored, transported, provided,

24   obtained, maintained or solicited and in knowing and with

25   reckless disregard of the fact that the person would be caused

1  to engage in a commercial sex act -- and I believe that should

2  have been minor person -- fourth, again, that the minor victim

3  had not yet attained the age of 18 years.

4        Those are the four elements of the crime the

5  government would have to prove.  Do you understand those?

6        THE DEFENDANT:  Yes, sir.

7        THE COURT:  Do you now admit that the government would

8  be able to prove that in your case?

9        THE DEFENDANT:  Yes, sir.

10        THE COURT:  With that, I am going to ask you to -- are

11  you going to do this by proffer or testimony?

12        MS. LYONS:  Testimony, Your Honor.

13        THE COURT:  If you would have a seat at the table with

14  Mr. Nelson, I am now going to hear some testimony about the

15  facts of your case.

16        MS. LYONS:  Thank you, Your Honor.  The government

17  would call Special Agent Harold Tripp Godbee to the stand.

18     (Harold D. Godbee, III is duly sworn.)

19        THE CLERK:  Please state your name for the

20  record.

21        THE WITNESS:  Harold Dennis Godbee, III.  I go by

22  Tripp Godbee.

23        THE CLERK:  What agency are you with?

24        THE WITNESS:  With the Federal Bureau of

25  Investigation.

(Harold D. Godbee, III-Direct by Ms. Lyons)

1      **DIRECT EXAMINATION**

2    BY MS. LYONS:

3    Q    Special Agent Godbee, is there a microphone in front of

4    you?

5    A    Yes, ma'am.

6    Q    If you'll lean into that microphone --

7    A    Sure.

8    Q    -- as much as you can.  I was just having a little problem

9    hearing you.  Thank you.  Special Agent Godbee, you're employed

10   with the FBI as a special agent.  How long have you held that

11   position?

12   A    Since 2016.

13   Q    And are you assigned to investigate a certain type of

14   violation or a certain type of case?

15   A    Yes, ma'am.  I investigate crimes against children and

16   human trafficking.

17   Q    And in that capacity in February of 2020 did you become

18   involved in a case related to the Gunn family?

19   A    Yes, ma'am.

20   Q    Can you tell the Court how that case began?

21   A    Yes, ma'am.  I got a phonecall from an agent in Texas who

22   said that he was during the course of investigation analyzing

23   pictures on a phone of a subject that he was looking into and

24   the EXIF data on some of those images -- EXIF data is data that

25   contains geolocation where the picture might have been taken,

(Harold D. Godbee, III-Direct by Ms. Lyons)                    19

1   or when it was taken, with what device it was taken on -- that

2   some of that was coming back to an area in or around Augusta

3   which is what I am responsible for.

4   Q   Do you recall the approximate date that you received that

5   called from the agent in Texas?

6   A   February 5th of 2020.

7   Q   And did the agent have possession of images of child

8   pornography of the minor victim in this case?

9   A   Yes, ma'am.

10  Q   And did he also have images that were not categorized as

11  child pornography at that time?

12  A   Yes, ma'am.

13  Q   So as a result of receiving this call and or lead from

14  Special Agent Anders in Texas, what did you do?

15  A   I asked him to send me the images of the minor victim that

16  he could send via the internet -- so what we could call clean

17  pictures or sanitized pictures -- so that I could start to

18  identify who the child was.  In the meantime he was sending me

19  the unsanitized or the images that contained the child

20  pornography via CD in a Fed Ex so the ---

21  Q   Is it fair to say that the first batch of pictures you

22  received only contained about four images?

23  A   Yes, ma'am.

24  Q   And that the second batch of pictures you received was

25  approximately 730 pictures?

1    A    Yes, ma'am.  The second batch was the ones that contained

2    the child pornography.

3    Q    So on February 5th after speaking to Special Agent Anders

4    the night before, did you begin to try and locate the minor

5    victim?

6    A    Yes, ma'am.

7    Q    What did you do in order to locate the minor victim?

8    A    Well, we had a general idea based on the latitude and

9    longitude of where some of the pictures were taken of where the

10   picture was taken.  So it was probably taken somewhere around

11   the Nicklaus Court/Palmer Court area in Columbia County.  In

12   some of the pictures of the minor victim that were just normal

13   pictures -- clean pictures -- that showed her outside of a

14   house, some of the structures in the area on the buildings were

15   unique.

16       They were, basically, row houses or condominiums.  So I

17   went to that area and was able to figure out pretty much which

18   road she took these pictures on because of the way that the

19   buildings were built.  Also, in one of the pictures there was a

20   bird feeder that just happened to be in the picture that she

21   was taking, I think, of herself near a car.  So I canvassed the

22   neighborhood and happened to see the bird feeder at another

23   residence that I didn't know was associated until later.

24       So at that point I figured out what school.  It was a

25   middle aged victim.  I figured out that children that lived in

1   that neighborhood went to Stallings Island.  So I went to

2   Stallings Island and asked the guidance counselor and principal

3   if they had seen this minor and showed them a picture and they

4   immediately said the minor's name which at that point I knew I

5   had the right person because in one of the pictures the minor

6   victim is wearing a necklace with individual letters and I

7   could see a "G" and like a "E" that would logically spell out

8   the name that they gave me.

9   Q    So at this point you've canvassed the neighborhood.  You

10  think you're in the right area and you have a potential name.

11  Are you able to then find a residence for the family that goes

12  with the minor victim in this case?

13  A    Yes, ma'am.  There were two -- there is a residence that

14  was listed on the family's paperwork, but it had burned down.

15  Q    What was that address?

16  A    It was 220 Nicklaus Court.  So from there I just went back

17  to where the bird feeder was and started working sort of

18  backwards from that point and figured out that in talking to

19  neighbors and different things that there were children at that

20  location.

21  Q    What location did you ultimately end up?

22  A    209 Nicklaus Court.

23  Q    And we're still on February 5th.  This is all happening

24  in the same day?

25  A    Yes, ma'am.

(Harold D. Godbee, III-Direct by Ms. Lyons)                22

1    Q    Do you make an investigative decision then to approach the
2    house?
3    A    Yes, ma'am.
4    Q    Do you call for assistance?
5    A    Yes, ma'am.  I called an agent in our office to come out
6    and meet me so that we could go to the door.
7    Q    Who did you call?
8    A    Special Agent Jonathan Escobar.
9    Q    Did you and Special Agent Escobar conduct a knock and talk?
10   A    Yes, ma'am.
11   Q    I apologize for using the term "knock and talk."  What was
12   your goal when you approached 209 Nicklaus Court?
13   A    My goal was to find out exactly what was going on -- if the
14   little girl was doing this to herself, exploiting herself by
15   herself or someone else was doing it, just kind of what was
16   going on because there are a lot of images and we had a good
17   address.  So we were going to the door to just gather more
18   information.
19   Q    Okay.  And when you and Special Agent Escobar went to the
20   door of 209 Nicklaus Court did anyone answer?
21   A    Ma'am?
22   Q    When you and Special Agent Escobar went to the door of 209
23   Nicklaus Court did anyone answer the door?
24   A    Yes, ma'am.
25   Q    Who came to the door?

1   A    Mr. and Ms. Gunn.

2   Q    Did you have an opportunity to speak to Ms. and Mr. Gunn at

3   that time?

4   A    Yes, ma'am.

5   Q    What did you tell them when they came to the door?

6   A    I started like I normally do when I do these with parents

7   in that we found images during an FBI investigation in another

8   state of who we believe is your daughter.  We showed the images

9   to Mr. and Ms. Gunn and they identified, yes, that is our

10  daughter, and I explained to them that the images were found on

11  a subject's phone and they were child pornography.

12  Q    At that time did you have any sort of reaction or feeling

13  about the notification that you just made?

14  A    I don't remember exactly when I had a weird feeling.  When

15  I first said it I remember the father being not as appropriate

16  as -- I've done a lot of these and there was just something

17  off.  The mother was very quiet and reserved and the dad was

18  asking more about, well, who did this?  Where is he?  I want to

19  find him.  Things like that.

20  Q    At some point did the conversation shift to telephones or

21  cellphones?

22  A    Yes, ma'am.  I asked him -- I asked both parents what kind

23  of phones their daughter used and if I could look at them and

24  explore them meaning could we search them.  At some point

25  during the conversation I asked if they would go retrieve an

1   iPhone is what we were primarily looking for at that time.

2   Q    And why were you looking for an iPhone at that time?

3   A    We believe that's what the minor was using to take at least

4   some of the pictures and also the parents had said that she had

5   an iPhone.

6   Q    And had Special Agent Anders provided you with EXIF data at

7   that point confirming that an iPhone had been utilized to take

8   the images of child pornography and non-child-pornography?

9   A    Yes, ma'am.  That's why we believed that she had taken the

10  pictures using an iPhone.

11  Q    And so was it an iPhone critical to the investigation?

12  A    Very much so.

13  Q    Okay.  So you asked the parents for the iPhone and what

14  happens?

15  A    I think the father went inside or either the mother went

16  inside.  They might have both gone inside to look for it.  At

17  some point they come back out and say the iPhone is gone; it's

18  lost.  They don't know where it is.  At that point it struck me

19  as very odd because they are very expensive.  It is relatively

20  a newer version and all of a sudden the child has lost it and

21  they really didn't know about it until I asked about it.

22  Q    Now during this conversation are you still outside of the

23  house?

24  A    Yes, ma'am.

25  Q    Do you have an opportunity while you're outside of the

1  house to speak to either Mr. Gunn alone or Ms. Gunn alone?

2  A   I spoke to both of them alone.

3  Q   Let's start with Mr. Gunn.  What, if anything, did Mr. Gunn

4  say to you while you were speaking with him alone?

5  A   He was generally asking questions about who did this.  Why

6  would someone do this?  Do we have any names?  I was asking him

7  is there anyone that comes in the house routinely.  Does she

8  have any boyfriends?  Things like that.  At some point he

9  starts to discuss his wife and some possible infidelity that

10  was in the marriage on her part when he went to a different

11  country to do work.

12  Q   Did you think that was odd?

13  A   I thought it was odd that -- the way that he was acting

14  when I had just told him that there was lots very explicit

15  images of his daughter in another state and possibly throughout

16  the internet.

17  Q   Did he say anything about his wife being in videos?

18  A   I am not sure he said it at that point, but eventually it

19  came out I believe through Amanda that there was some sexual

20  activity that was recorded at some point while they were

21  married.

22  Q   Now did you have an opportunity to speak to Ms. Gunn

23  outside alone on the porch at any point?

24  A   Yes, ma'am.

25  Q   Tell us about that conversation.

1   A    We spoke.  I believe Mr. Gunn had gone inside to look for

2   the phones or other phones that I had asked him to provide and

3   at that point I felt like something was not right and I asked

4   Ms. Gunn if there is something going on.  If you need help

5   either, you know, give me a sign, do something to let me know

6   that you need help and we'll get it figured out and we'll get

7   you out of this situation.

8   Q    Did she indicate to you at all that she needed help?  Did

9   she give you any sign?

10  A    No, ma'am.

11  Q    Okay.  After this happens and you're going back and forth

12  about phones, at any point do you go into the home?

13  A    Yes, ma'am.  Eventually, I told the parents that I just

14  needed for my peace of mind to lay eyes on the child.  They

15  told me that the child had recently had surgery on her ear and

16  was asleep.  So I asked them probably more than two or three

17  times if I could go in and just at least look at the child to

18  make sure that the child was alive and okay which I did.

19      I went in.  She was laying in a bed downstairs which I

20  understand was the parents' bedroom.  I opened the door and

21  just said her name.  I said, "Hey."  I introduced myself and

22  she just sort of looked up and kind of waved and seemed like

23  she was asleep.

24  Q    At that point did you seek permission to go check the minor

25  victim's room?

(Harold D. Godbee, III-Direct by Ms. Lyons)                 27

1  A   Yes, ma'am.  I asked them -- the parents -- if I could --

2  if myself and Special Agent Escobar could look around her room

3  or where she might hang out to see if we could see any pictures

4  on walls or maybe pictures of friends to just give us an idea

5  of kind of what was -- what was happening and they allowed us

6  to and we went and looked in her room.

7  Q   Do you recall seeing anything that later stuck out in your

8  mind -- maybe not in that moment but later as the investigation

9  went on?

10  A   Yes, ma'am.  We found a bottle of alcohol in the room that

11  at the time was alarming to me, but I also know that kids

12  sometimes do that.  So we told the parents.  We didn't take it.

13  We told them what was going on and now looking back I realize

14  that that was a bigger deal than I knew at the time.

15  Q   And so when you say alcohol, just to be clear we were

16  hitting Covid at that point.  We're not talking about rubbing

17  alcohol.  We're talking about Vodka?

18  A   Yes, ma'am, alcohol to drink.

19  Q   And you made the parents aware of that?

20  A   Yes, ma'am.

21  Q   Was there any sort of reaction?  Do you recall?

22  A   I remember the dad -- in my opinion he sort of overreacted

23  in that he dropped to his knees and like put his hands over his

24  face which was a little odd to me.

25  Q   And at the time you're making this visit the minor victim

(Harold D. Godbee, III-Direct by Ms. Lyons)                28

1   is approximately 13 years old; is that correct?

2   A   Yes, ma'am.

3   Q   Okay.  So after your visit on February 5th with Special

4   Agent Escobar do you leave the Gunn residence?

5   A   Yes, ma'am.

6   Q   Okay.  And on the 6th do you return -- you and other agents

7   return to do a consent search?

8   A   Yes, ma'am.  On the 6th we did something called a child

9   adolescent forensic interview on the minor.  While that was

10  happening I sent agents to interview and try to get consent to

11  search the house of the Gunns.

12  Q   Had something changed between the night -- the day of the

13  5th into the day of the 6th that altered the trajectory of your

14  investigation?

15  A   Yes, ma'am.  At some point I believe it was late at night

16  on the 5th I received the CD or DVD containing the child

17  pornography images and while I was reviewing them I saw in the

18  series -- in a series of pictures of the minor victim,

19  basically, the tip of a shoe and to me it looked like the

20  person taking the photograph that that was that person's shoe.

21  It had a distinct marking on it that we could see in the

22  picture and based on the series of pictures it didn't look like

23  a shoe that was laying around.  It looked like a shoe that

24  someone was wearing because there was multiple camera angles of

25  this little girl -- the pictures taken.

(Harold D. Godbee, III-Direct by Ms. Lyons)          29

1      So at that point we were looking for that shoe and we -- I

2  had a better idea or suspicion that something was going on much

3  more than we thought.  So that's why I sent the agents to do

4  the consent search and try to find the shoe.

5  Q   Now at the time that the special agents are conducting or

6  beginning to conduct the consent search at 209 Nicklaus Court,

7  where are you?

8  A   When they started the search I believe I was either at the

9  child interview with the minor victim and her mother or I was

10  meeting with the mother at our office.  I don't remember

11  exactly where I was.  At some point I left to meet the agents

12  that I had sent to the house for the consent search.

13  Q   And on February 6th upon first being questioned about that

14  shoe in the picture what is the minor victim's reaction or

15  position?

16  A   So during the child forensic interview we brought in

17  someone that specifically is trained to interview children and

18  she presented that to the minor victim and asked who that was

19  and the minor victim, basically, said she wasn't sure who that

20  was, and we asked how these pictures were taken because we

21  could see your hands.  Obviously, someone else is taking them

22  and she mentioned a couple of different things.  I think she

23  mentioned a tripod was used and she didn't know whose shoe it

24  was.

25  Q   At the consent search are you looking for the sneakers at

1  209 Nicklaus Court?  Are the sneakers a goal at that point or

2  the shoes in the picture?

3  A   Yes.  That was my most important goal and that's what I

4  expressed to the agents that I sent there.

5  Q   And during the search for the sneakers do Ms. Gunn and the

6  minor victim come into the house during the search for the

7  sneakers?

8  A   At some point they are there.  Yes, ma'am.

9  Q   Did you complete the search that day and begin to leave the

10 residence without finding these shoes?

11 A   Yes, ma'am.  We had -- we did the search, looked around at

12 things, and as we were leaving I believe I was the last person

13 to leave.  There was one person in front of me and the way that

14 the door opens to the room -- to the main room of the house

15 where the front door is -- when the door opens, it covers a

16 shoe rack and we just didn't look there because the door was

17 mostly open, and as we're leaving an agent -- Agent McKee --

18 was in front of me and he looked at the shoe -- this pair of

19 shoes sitting on this rack, and he said, "Hey.  Are these in

20 play?"  At that point I looked and I said, "Yes, and we picked

21 them up and my first glance and I believe his first glance as

22 well was that that was the shoes we were looking for.

23 Q   Had you made it abundantly clear to Mr. Gunn that you were

24 looking for a white pair of sneakers?

25 A   Yes, ma'am.

(Harold D. Godbee, III-Direct by Ms. Lyons)                 31

1   Q   So after February 6th and the consent search you find the

2   sneakers, do you come back on the 7th to conduct a full search

3   of the house?

4   A   Yes, ma'am.

5   Q   With a search warrant authorized by a judge?

6   A   Yes, ma'am.

7   Q   And has Mr. Gunn already been arrested?

8   A   Yes, ma'am.  I arrested him the night of the consent search

9   via complaint.

10   Q   Okay.  But is Ms. Gunn in custody on February 7th?

11   A   Ms. Gunn is not, no, ma'am.

12   Q   Okay.  So during the course of your investigation did you

13   have the opportunity to interview Ms. Gunn?

14   A   Several times, yes, ma'am.

15   Q   And during the course of your investigation did you have

16   the opportunity to interview the minor victim?

17   A   Yes, ma'am.

18   Q   What, if anything, has the minor victim told you about

19   prostitution?

20   A   Can you repeat the first part?

21   Q   What, if anything, has the minor victim told you about the

22   issue of prostitution?

23   A   The minor victim has told me that she was forced to engage

24   in prostitution because of something called the "Order."

25   Q   Can you explain what the Order is?

1  A    The minor victim has told me that the Order is a group of

2  people that are worshipers of Satan that the family owed some

3  sort of a debt to and that as a result the minor victim had to

4  engage in prostitution to pay and to protect the family.

5  Q    And who did the minor victim tell you taught her about the

6  Order?

7  A    Her father.

8       MS. LYONS:  Your Honor, I beg your indulgence.  I am

9  losing the monitor here.

10       And, Special Agent Godbee, did the minor victim in

11  this case indicate to you whether or not this was something

12  that had been just mentioned on one occasion or multiple

13  occasions?

14       THE WITNESS:  The minor victim indicated that on

15  multiple occasions her and her mother and father talked about

16  the Order and what was required and what could happen to the

17  family if things -- that they didn't do what the Order said.

18  Q    Okay.  So the minor victim indicated that her mother was

19  present during some of these meetings?

20  A    Yes, ma'am.

21  Q    Can you tell the Court a little bit about what the minor

22  victim told you happened after your initial visit to the home

23  on February 5, 2020, when you conducted that first parental

24  notification?

25  A    Yes, ma'am.  The minor victim has told me many times that

(Harold D. Godbee, III-Direct by Ms. Lyons)                    33

1  after we showed up there was some panic in the house, that the

2  parents were worried about the FBI showing up, and as a result

3  things began being thrown out or damaged or discarded or taken

4  away from the house.  Specifically, the minor victim said that

5  she was told to erase the iPhone that we were looking for and

6  put it behind a gazebo which was near maybe 200 yards from the

7  house.  She also said that in a closet was a bag of sex toys,

8  bondage equipment, clothing that was packed up and thrown out

9  probably taken away by Michael Gunn from the house.

10 Q   Was the iPhone ultimately replaced?  The one that she was

11 told to wipe and put near the gazebo -- was that iPhone

12 replaced?

13 A   Yes, ma'am.

14 Q   By whom?

15 A   Her mother.

16 Q   Ms. Gunn?

17 A   Yes, ma'am.

18 Q   Okay.  In reference to the prostitution and the Order, did

19 the minor victim tell you whether or not she had to engage in

20 sex acts for money?

21 A   Yes, ma'am.

22 Q   And approximately how much was she paid for those sex acts?

23 A   Anywhere from 100 to $200.

24 Q   And what did she do with the money?

25 A   She would give it to her father.

1  Q   How did the minor's father set up communicating with people

2  to get dates or even advertising the minor?

3  A   Through different online platforms.

4  Q   Can you give us an example?

5  A   Sure.  So I know one of them was Craigslist that the minor

6  victim was advertised on for prostitution.  Her pictures and

7  videos were also distributed on other websites as well like

8  FetLife.

9  Q   What is that?

10 A   FetLife is a pornography website that generally caters to

11 fetishes that people are into.

12 Q   And it's meant for adults?

13 A   Yes, ma'am.

14 Q   Okay.  And was she also posted on PornHub?

15 A   Yes, ma'am.

16 Q   Which is meant for adults?

17 A   Yes, ma'am.

18 Q   Now you mentioned Craigslist.  Did you find evidence in

19 emails that substantiated the minor's allegations related to

20 being advertised on Craigslist for sex?

21 A   Yes, ma'am.

22 Q   And did that eventually lead to the arrest of someone the

23 minor victim had told you about?

24 A   Yes, ma'am.

25 Q   Who was that?

1  A    His name is Jonathan Grantham.

2  Q    Where did Jonathan Grantham take the minor to engage in

3  acts of prostitution or commercial sex agents?

4  A    He took her to a hotel on at least two occasions in North

5  Augusta or across the bridge in Clearwater across the

6  Georgia/South Carolina border.  I believe it is actually in

7  Clearwater, South Carolina.

8  Q    And from where did he pick the minor victim up in Georgia?

9  A    From outside of her residence which at the time was 209

10 Nicklaus Court.

11 Q    In Columbia County?

12 A    Yes, ma'am.

13 Q    Therefore, having traveled in interstate commerce?

14 A    Yes, ma'am.

15 Q    And when you reference Craigslist and FetLife and

16 PornHub -- all utilizing the internet?

17 A    Yes, ma'am.

18 Q    All affecting interstate commerce?

19 A    Yes, ma'am.

20 Q    Did the minor have a pseudonym that was utilized during the

21 sex trafficking?

22 A    She had several that she was either known by or went by.

23 Q    Can you tell us one that you remember?

24 A    ToxicDove was one.  Riley Cruise was another.

25 Q    I'm sorry that I'm skipping around, Special Agent Godbee.

1  Going back to February 5th you mentioned being able to lay

2  eyes on the minor victim.  Why did the parents tell you the

3  minor victim was laying down in bed?

4  A    That she had just had a recent ear surgery.

5  Q    And did the minor victim later tell you anything about the

6  veracity of that statement, the truthfulness of that statement?

7  A    She said that that wasn't true -- that she was told to go

8  get in bed and lay down.

9  Q    And in relation to the prostitution, did the prostitution

10  only occur out of the house?

11  A    No, ma'am.

12  Q    Where else did the prostitution occur?

13  A    Inside the Gunn residence.

14  Q    Is there anything specific that the minor victim told you

15  about occurred in the house?

16  A    That there were times when she would have to have sex with

17  men that came into the house while her parents were there.

18  Q    So now I want to switch back to your interviews with Amanda

19  Gunn.  Okay?  Were you able to see a pattern between what had

20  happened to the minor victim and anything that Ms. Gunn told

21  you?

22  A    Yes, ma'am.

23  Q    Okay.  Give me an idea of what the pattern was that you

24  saw?

25  A    The more that I talked to Ms. Gunn I realized that Mr. Gunn

1  had abused her and forced her into prostitution as well, had

2  put tattoos on her body in similar places that the juvenile had

3  things written on her and in similar wording or messages were

4  used on the minor victim that I was told about by Ms. Gunn and

5  I have since seen.

6  Q   All right.  Let's take things one by one.  What did

7  Ms. Gunn say or tell you about the Order?

8  A   That, basically, the same thing that the minor victim had

9  told me that she was forced to do things in order to protect

10 the family from the Order.

11 Q   And was one of those things prostitution?

12 A   Yes, ma'am.

13 Q   Did she tell you anything about sex trafficking?

14 A   She did.  She told me that on some occasions she was taken

15 to different cities and was forced to engage in sex with men.

16 On another occasion she was forced to hold up a sign with I

17 believe either her name or a name that she went by online.  She

18 was posted on PornHub which the juvenile was also posted on

19 PornHub.  So that was all very similar to what I had seen with

20 the juvenile.

21 Q   And did Ms. Gunn have a pseudonym online?

22 A   Yes, ma'am.

23 Q   Do you remember what that was?

24 A   Lexi Haze was one, I believe.

25 Q   And have you -- since the investigation began were you able

1  to find images online of Ms. Gunn?

2  A   Yes, ma'am.

3  Q   Okay.  Anything related to torture or bondage?

4  A   Ms. Gunn has told me instances that she was put in severe

5  bondage and tortured by Mr. Gunn.

6  Q   And based on -- is there a photograph in this case of the

7  minor victim with words written on her?

8  A   Yes, ma'am.

9  Q   Can you describe what you recall -- and I understand you

10 won't recall it exactly, but if you can describe that image for

11 the court.

12 A   Of the minor victim?

13 Q   Yes, please.

14 A   There is two that stick out to me.  One, the minor victim

15 has the word "whore" written on her upper thigh or buttocks and

16 it's written in such a way that she couldn't write it herself.

17 There is another image where the minor victim, I believe, is

18 laying on her back.  Her breasts are exposed and written across

19 her abdomen around her nipples under her breasts are the same

20 types of derogatory terms that I know are on Amanda Gunn's body

21 because I have now seen them.  There is a phone number written

22 on the minor victim's abdomen and different phrases -- sexually

23 explicit phrases.

24 Q   Special Agent Godbee, if you'll forgive me, on Ms. Gunn on

25 the side of one breast does it say "rape bait"?

1  A   I believe so.  They are faded, but if I am told that's what

2  it says by her, I can make that out.

3  Q   The different words related to Ms. Gunn and the minor --

4  slut, whore, cum -- words like that?

5  A   Yes, ma'am.

6  Q   And, in fact, a phrase "no means yes" -- have you heard

7  that?

8  A   Yes, ma'am.

9        MS. LYONS:  I beg the Court's indulgence.

10        After your initial interview of Ms. Gunn on

11  February 5th and 6th during the CAFI and consent searches,

12  did you again talk to her on February 13th at the Child

13  Forensic Center?

14        THE WITNESS:  I'm not sure of the exact date, but I

15  talked to her multiple times.

16  Q   Did you once again give her the opportunity to tell you if

17  anything was going on?

18  A   Yes, ma'am.

19  Q   Okay.  Do you recall any specifics of that conversation?

20  A   I believe that was the conversation that she first told us

21  about the parts that she was taken to a hotel in North Augusta

22  or across the bridge, but I could be getting that wrong with --

23  she was, I think, interviewed four different times by the child

24  forensic interviewer.

25  Q   And based on your review of emails and the EXIF data from

(Harold D. Godbee, III-Direct by Ms. Lyons)                40

1   the photos, do you believe all of this occurred between

2   December of 2018 up and until the date that you arrived at the

3   Gunn residence in February of 2020?

4   A    Yes, ma'am.

5   Q    Thank you.

6        Your Honor, that would be what the government would have

7   proved at trial.

8            THE COURT:  Mr. Nelson, do you have any questions

9   you'd like to ask the witness?

10            MR. NELSON:  No questions, Your Honor.

11            THE COURT:  Mr. Nelson and Ms. Gunn, if you would

12   return to the lecturn, please.

13            Ms. Gunn, you have just heard the testimony as did I.

14   Is there anything that Agent Godbee told me that is wrong?

15            THE DEFENDANT:  No, sir.

16            THE COURT:  So you agree with everything that he's

17   described today?

18            THE DEFENDANT:  Yes, sir.

19            THE COURT:  Do you still want to plead guilty to count

20   one, sex trafficking conspiracy?

21            THE DEFENDANT:  Yes, sir.

22            THE COURT:  Are you pleading guilty because you are,

23   in fact, guilty of committing this crime?

24            THE DEFENDANT:  Yes, sir.

25            THE COURT:  The record should now reflect that

1   Ms. Gunn has plead guilty to count one of the superceding

2   indictment which is the charge of sex trafficking conspiracy.

3   Her plea should be now signed and entered, please.

4           THE CLERK:  The defendant's plea of guilty to count

5   one has been entered.

6           THE COURT:  With the entry of the signed plea into the

7   record of this hearing, I now find that Ms. Gunn is competent

8   and fully understands the charge against her.  There is a

9   factual basis supporting her plea of guilty containing each of

10  the essential elements of the offense.  She knows the statutory

11  punishment which includes mandatory minimum incarceration and

12  supervised release that could be imposed upon a conviction of

13  this count one charge.  She knows her jury rights which she has

14  knowingly and voluntarily waived.

15          Ms. Gunn's decision to plead guilty to this charge was

16  voluntary, knowing and not the result of any force, pressure,

17  threats or promises other than the promises made by the

18  government in the Plea Agreement; therefore, her plea is

19  accepted and I now adjudge Ms. Gunn guilty of count one, sex

20  trafficking conspiracy, of the superceding indictment based on

21  her guilty plea.

22          I order the preparation of the Presentence Report and

23  direct that copies be provided to the parties when available.

24  When the final report has been issued I will schedule

25  sentencing.  Pending sentencing then, I remand Ms. Gunn to the

1    custody of the United States Marshal.  We are concluded.

2         (The hearing is concluded.)

CERTIFICATE OF REPORTER

I, Lisa H. Davenport, Federal Official Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically-reported proceedings held and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

_____

Lisa H Davenport, RPR, FCRR

Federal Official Reporter