## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| AMANDA GUNN, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | CV 122-151 |
| | ) | (CR 120-014) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## GOVERNMENT'S MOTION TO DISMISS GUNN'S 28 U.S.C. § 2255 MOTION

Before the Court is Amanda Gunn's motion to vacate her conviction and sentence under 28 U.S.C. § 2255. (Doc. 327.)[1] Gunn's claims are procedurally barred. Her motion should be dismissed.

### Background

#### A.   Facts.

Gunn[2] and her then-husband, Michael Peyton Gunn, forced their pre-teen daughter into prostitution. (Docs. 285 at 6-9; 334 at 17-38.)

#### B.   Superseding Indictment and Penalty Certification.

The grand jury returned a nine-count superseding indictment against Gunn and Michael. (Doc. 186.) Both were charged with conspiracy for sex trafficking of

---

[1] "Doc." refers to the Court's ECF docket in the underlying criminal case unless otherwise noted.

[2] Amanda Gunn is referred to as "Gunn" in this motion, while her husband will be referred to as "Michael."

their minor daughter and obstruction of a sex trafficking investigation.  (Doc. 186 at 1, 10.)  Michael was additionally charged with sex trafficking of his minor daughter, coercing and enticing his minor daughter to engage in sexual activity, four counts of production of child pornography by a parent, and possession of child pornography. (Doc. 186 at 3-9.)  The Government filed a penalty certification setting forth Gunn's potential prison sentence as not less than 15 years but not more than life for the sex trafficking conspiracy, and not more than 25 years for the obstruction charge.  (Doc. 187 at 1-3.)

### C.   *Gunn's Motion to Sever Denied.*

Gunn moved to sever her trial from Michael's.  (Docs. 198; 201.)  She argued that a joint trial would violate her fair-trial rights because she would be prejudiced since the evidence against Michael outweighed the evidence against her.  (Doc. 198 at 2; 201 at 4.)  A United States magistrate judge denied Gunn's motion, reasoning that she failed to show specific and compelling prejudice from a joint trial.  (Doc. 205 at 1, 3.)  The court found that any spillover effect from the evidence against Michael would not justify severance because a limiting instruction for the jury to consider evidence against each defendant separately would "suffice to cure any risk of prejudice."  (Doc. 205 at 5-6.)  Gunn did not object to the magistrate judge's denial or appeal to this Court.[3]

---

[3] Notably, at the pre-trial conference, Michael moved this Court to reconsider another ruling by the same magistrate judge.  (Doc. 332 at 14-15.)  But, despite being given the opportunity, Gunn did not move the Court to reconsider the magistrate judge's denial of her severance motion.  (Doc. 332 at 15-16.)

### D.    Gunn's Knowing and Voluntary Guilty Plea.

Ultimately—pursuant to a written plea agreement—Gunn pled guilty to the sex trafficking conspiracy count of the superseding indictment.  (Docs. 232; 233; 334.) Gunn signed the plea agreement after careful review with her attorney, who fully explained all of her rights to her.  (Doc. 233 at 13.)

### 1.    Plea Agreement.

The plea agreement set forth the charge to which Gunn was pleading guilty followed by the crime's elements and factual basis.  (Doc. 233 at 1-2.)  It provided that Gunn's cooperation was required.  (Doc. 233 at 5.)  As part of this cooperation, Gunn provided a proffer to the Government.  (Doc. 285 at 12.)  Gunn stated that Michael tortured her.  (Doc. 285 at 12.)  The torture "included extreme bondage, being locked in a closet, and having water dripped on her head for hours."  (Doc. 285 at 12.)  Gunn stated that she prostituted herself because a street gang threatened her family, and that the money from the prostitution was used to pay the family's bills.  (Doc. 285 at 12.)  She said that Michael advertised her sexual services on various online platforms, and that she performed the services in hotels and houses across Augusta, Georgia and North Augusta, South Carolina.  (Doc. 285 at 12.)  She did not recall engaging in sexual acts while her minor daughter was present.  (Doc. 285 at 12.)  Nor did she recall being present during any sexual acts performed by her daughter.  (Doc. 285 at 12.)

The agreement provided that the Government, "in its **sole discretion**," would decide whether Gunn's cooperation qualified as "substantial assistance" to warrant

the Government moving for downward departure under U.S.S.G. § 5K1.1 or for sentence reduction under Fed. R. Crim. P. 35. (Doc. 233 at 5 (emphasis in original).) The agreement stated "[i]f such a motion is filed, the Court, in its sole discretion, will decide whether, and to what extent, Defendant's sentence should be reduced. The Court is not required to accept any recommendation by the government that the Defendant's sentence be reduced." (Doc. 233 at 5.)

The plea agreement also outlined the penalties Gunn was facing, including the possible prison sentence between the mandatory minimum of 15 years to life, and stated that:

> No one has promised Defendant that the Court will impose any particular sentence or a sentence within any particular range. The Court is not bound by any estimate of sentence given or recommendations made by Defendant's counsel, the government, the U.S. Probation Office, or anyone else. The Court may impose a sentence up to the statutory maximum. Defendant will not be allowed to withdraw her plea of guilty if she receives a more severe sentence than she expects.

(Doc. 233 at 3.)

The agreement discussed the Court's use of the advisory sentencing guidelines, explaining that the Court would consider the guideline range, possible departures, and other factors under 18 U.S.C. § 3553(a). (Doc. 233 at 3.) The Government promised to: (1) provide full and accurate information to the Court and the U.S. Probation Office to determine guideline calculations; (2) move for Gunn to receive a three-point reduction for acceptance of responsibility, under U.S.S.G. § 3E1.1, based on her timely notification to enter a guilty plea; and (3) recommend that Gunn be sentenced to the mandatory minimum of 15 years' imprisonment. (Doc. 233

at 4.)  The Government would dismiss any other count of the superseding indictment that remained pending against Gunn.  (Doc. 233 at 4.)

Moreover, the agreement explained that Gunn was waiving her constitutional right to plead not guilty and have a jury trial where she would otherwise have the rights to confront and cross-examine witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.  (Doc. 233 at 10-11.)  She was also waiving her rights to appeal and collaterally attack her conviction and sentence within limited exceptions.  (Doc. 233 at 9.)

### 2.    *Rule 11 Hearing.*

#### a.    *Plea Colloquy.*

The Court held a lengthy and detailed Rule 11 hearing where it accepted the plea agreement, and found that Gunn's guilty plea was knowingly, voluntarily, and freely made.  (Doc. 334 at 41.)  The Court confirmed with Gunn that it was her intention to enter a guilty plea.  (Doc. 334 at 4.)  It asked whether "anyone threatened, pressured or forced [her] to come into court this afternoon and change [her] plea to guilty," to which Gunn responded, "No, sir."  (Doc. 334 at 5.)  The Court elicited biographical information from Gunn and conducted questioning to determine her competency.  (Doc. 334 at 5-6.)  It reviewed the offenses with which Gunn was charged in the superseding indictment.  (Doc. 334 at 8.)  It asked Gunn whether she had seen the indictment and reviewed it with her attorney to which Gunn responded that she had.  (Doc. 334 at 8.)  The Court also asked Gunn whether she "had as much time to

talk to [her attorney] as [she] would like to" about pleading guilty.  (Doc. 334 at 8.)
Gunn answered, "Yes, sir," and, again, confirmed that she wished to plead guilty.
(Doc. 334 at 8.)

The Court explained the constitutional rights that Gunn had, including the
right to a jury trial, and that she would be giving up those rights by pleading guilty.
(Doc. 334 at 8-10.)  The Court stated, "You will simply be found guilty of this charge
based upon your guilty plea. There will be no trial of any kind on count one. Do you
understand all of that?"  (Doc. 334 at 10.)  Gunn answered, "Yes, sir."  (Doc. 334 at
10.)  The Court asked, "Knowing these rights, do you wish to waive or give up your
right to a jury trial and plead guilty to count one?"  (Doc. 334 at 10.)  Gunn answered,
"Yes, sir."  (Doc. 334 at 10.)

The Court referenced the plea agreement.  (Doc. 334 at 10.)  It asked, "Did you
sign this Plea Agreement and initial the pages, Ms. Gunn?"  (Doc. 334 at 10.)  Gunn
answered, "I did."  (Doc. 334 at 10.)  It asked, "Did you go over it carefully with [your
attorney] before you signed it?"  (Doc. 334 at 10.)  Gunn answered, "Yes, sir."  (Doc.
334 at 11.)  The Court specifically reviewed certain provisions.  It told Gunn, "The
Government has agreed that at sentencing they will recommend . . . to the Court that
you be sentenced to the mandatory minimum of 15 years of incarceration. Remember,
that is a recommendation."  (Doc. 334 at 11.)  It told Gunn to "[l]isten very carefully"
about the appellate and collateral attack waivers:

> The first part says you're waiving your right to appeal your conviction
> and sentence directly on any ground with three exceptions. Those
> exceptions are you may appeal your sentence if your sentence should
> exceed the statutory maximum penalty for this charge or should your

sentence exceed the applicable sentencing guideline range for your case
or should the government appeal.

The second part is that you are waiving the right to collaterally attack
your conviction and sentence in a post-conviction proceeding on any
ground. There is one exception to this part of the waiver and that is you
are not waiving or giving up your right to base a claim on ineffective
assistance of counsel.

(Doc. 334 at 12.)  Gunn said that she understood the waivers.  (Doc. 334 at 12.)

The Court also discussed with Gunn the potential penalties she faced.  "The
law says that upon a conviction of this offense you could be imprisoned for not less
than 15 years, nor more than life."  (Doc. 334 at 13.)  "So when you receive a prison
sentence—and it will not be less than 15 years in your case—you will be required to
serve that sentence in custody in full."  (Doc. 334 at 13.)  Gunn stated that she
understood.  (Doc. 334 at 13.)  The Court explained that the U.S. Probation Office
would prepare a pre-sentence investigation report (PSR), which would be used to
determine the sentencing guidelines applicable to Gunn's case.  (Doc. 334 at 14-15.)
The Court further explained how it would use the guidelines, which it stated were
advisory.  (Doc. 334 at 16.)  "I can sentence you within the range of months that the
guidelines suggest or I can go below the range or I can go above the range. Do you
have any questions?"  (Doc. 334 at 16.)  Gunn responded, "No, sir."  (Doc. 334 at 16.)
The Court outlined the elements of the crime that the Government would need to
prove to convict Gunn.  (Doc. 334 at 16.)  Gunn admitted that she would be convicted.
(Doc. 334 at 17.)

### b.  *Factual Basis.*

The Government presented the testimony of FBI Special Agent Harold D. Godbee, III to show the factual basis for the elements.  (Doc. 334 at 17.)  Godbee testified that he received a phone call from law enforcement in Texas informing him that it found pornography of a minor girl as part of its investigation.  (Doc. 334 at 18.)  Scenes from the image in the photograph appeared to be located in Augusta, Georgia.  (Doc. 334 at 19.)  Godbee traced the origins of the photograph to the residence of Gunn and Michael.  (Doc. 334 at 20-21.)  Godbee went to the residence where he met the couple and asked if they recognized the girl in the photograph.  (Doc. 334 at 22-23.)  The couple identified the girl as their daughter.  (Doc. 334 at 23.)  Godbee asked them for the iPhone on which the image was produced.  (Doc. 334 at 23-24.)  But, the couple stated their daughter lost the phone.  (Doc. 334 at 24.)  While Godbee was alone with Gunn, he asked her whether she needed help, and she said no.  (Doc. 334 at 26.)  Godbee received more photos from Texas law enforcement.  (Doc. 334 at 28.)  The photos captured the shoe of the photographer.  (Doc. 334 at 28.)  Godbee returned to the Gunn residence where he found the shoes, which belonged to Michael.  (Doc. 334 at 28-30.)

The minor girl was forensically interviewed.  (Doc. 334 at 31.)  She told Godbee that her parents instructed her to hide her iPhone and erase its contents.  (Doc. 334 at 33.)  She said that Gunn bought her a new iPhone.  (Doc. 334 at 33.)  She told Godbee that her parents forced her to engage in prostitution to ensure the family's protection from a satanic order.  (Doc. 334 at 31-32.)  Michael, the girl's father,

arranged dates with men through various online platforms.  (Doc. 334 at 34.)  She was paid $100 to $200 for sex acts, and she gave the money to Michael.  (Doc. 334 at 33.)  Godbee researched the posts on the online platforms and found one of the men with whom the child engaged in sex acts.  (Doc. 334 at 34-35.)  This man had sex with the child in South Carolina.  (Doc. 334 at 35.)  But, there were times when the child was forced to have sex with men at her home while both parents were present.  (Doc. 334 at 36.)  Godbee learned that Michael also forced Gunn into prostitution in the same manner as the child.  (Doc. 334 at 36-37.)  Michael etched derogatory words and images onto the child's body.  (Doc. 334 at 38.)  These words and images were also found on Gunn's body.  (Doc. 334 at 38.)

When Godbee finished testifying, the Court asked Gunn, "Is there anything that Agent Godbee told me that is wrong?"  (Doc. 334 at 40.)  Gunn answered, "No, sir."  (Doc. 334 at 40.)  She told the Court that she wanted to plead guilty to the sex trafficking conspiracy because she was "in fact, guilty of committing this crime."  (Doc. 334 at 40.)

### c.    *Findings and Next Steps.*

The Court accepted Gunn's guilty plea, finding that: (1) Gunn was competent and fully understood the charge against her; (2) there was a factual basis for the charged crime's elements to support her guilty plea; (3) she knew the statutory punishment she was subject to, which included a mandatory minimum; and (4) she knew her jury-trial rights, which she waived.  (Doc. 334 at 41.)  The Court stated that it would schedule sentencing after preparation of the PSR.  (Doc. 334 at 41.)

### E.   *Gunn Testified at Co-Defendant's Trial.*

As part of Gunn's promise to cooperate, the Government presented her testimony at Michael's trial. (Doc. 270.) Gunn testified that she shares a son with Michael and that her daughter was not Michael's biological child, but that he adopted her daughter when her daughter was five or six years old. (Doc. 270 at 5-7.) Gunn testified that she mainly supported the household and was gone a lot. (Doc. 270 at 8-10.) But, the prosecutor elicited additional testimony from Gunn that she only worked weekdays, and that she still spent significant periods of time at home, including weekends. (Doc. 270 at 9.) Gunn testified that Michael worked from home on computers, but she also admitted that she never saw a client, he never had cash on hand, and there were times that their home's utilities were turned off. (Doc. 270 at 8, 10.)

Gunn testified that she was forced into prostitution because Michael told her that if she did not prostitute herself, a dangerous street gang would kill her family and her children. (Doc. 270 at 15.) But, she never went to the police. (Doc. 270 at 15.) Gunn stated that Michael had her pose in photographs naked and made her flirt with men online. (Doc. 270 at 18.) And, when she did not flirt like she was supposed to, he had her gang raped in their home. (Doc. 270 at 20-21.) He made her drink alcohol and take pills before the rape, recorded the rape, and then posted the video on a pornography website. (Doc. 270 at 21.) Gunn testified that Michael etched tattoos on intimate parts of her body because, "the Order"—a satanic group who

rescued her from the gang's forced prostitution—was unhappy with her for being "a whore." (Doc. 270 at 14, 22-23.)

Although her family was struggling financially, Gunn stated that Michael bought their daughter an expensive iPhone. (Doc. 270 at 35.) She testified that when FBI Special Agent Godbee came to her home asking for this iPhone, she was surprised that Michael told him it was lost. (Doc. 270 at 41.) She added that her daughter sent her a text message from the phone that morning. (Doc. 270 at 41.) She said that when she was alone with Godbee that he asked her if she needed help, but that she refused because she was scared. (Doc. 270 at 42.) She testified that after Godbee left, Michael had her clean out the garage and a closet to remove and destroy items, including a flash drive and a laptop. (Doc. 270 at 43-44.) She said that she did not ask Michael any questions. (Doc. 270 at 44.) She said that she slept in the living room that night while her daughter slept in the master bedroom, where she assumed her daughter was alone. (Doc. 270 at 44-45.) The prosecutor asked Gunn about the iPhone. (Doc. 270 at 45.) Gunn stated that Michael said he was going to break it at some nearby railroad tracks. (Doc. 270 at 45.) Gunn also identified the shoes, which the FBI seized, as belonging to Michael. (Doc. 270 at 46-47.) The prosecutor asked Gunn if she wore the shoes while photographing her daughter naked, and she answered that she did not. (Doc. 270 at 47.)

Gunn testified that she was interviewed by law enforcement several times, but she finally decided to tell the truth about Michael and his abuse after she was arrested. (Doc. 270 at 48.) She stated that she pled guilty to conspiracy to sex traffic

her daughter "[b]ecause I knew I had failed to protect my daughter." (Doc. 270 at 48.) She added that she promised to be truthful in the hope that she would receive a reduced sentence. (Doc. 270 at 49.) She acknowledged that it was the Court which would decide whether she received a reduced sentence. (Doc. 270 at 49.) She acknowledged that "nobody had promised [her] [her] sentence," and that the judge "could give [her] more than the mandatory minimum." (Doc. 270 at 69.)

### F.    PSR.

#### 1.    Offense Conduct.

Gunn's advisory-guideline calculations were based on her offense conduct. (Doc. 285 at 6.) The PSR described her conduct by showing how Gunn and Michael forced their pre-teen daughter into prostitution. Gunn was married to Michael with whom she shared two children, a girl and a boy. (Doc. 285 at 7-8.) Michael adopted the girl child, who Gunn had from a previous relationship. (Doc. 285 at 8.) The family moved to Georgia when the child was in "about the fourth or fifth grade." (Doc. 285 at 9.) It was around that time when Michael had sex with the child. (Doc. 285 at 9.) He also forced Gunn into prostitution, telling Gunn that the family was being threatened by a criminal street gang. (Doc. 285 at 6.) Later, Michael told Gunn that "the Order," a Satan worshipping cult, protected the family from the gang, but that Gunn needed to have sex with "the Order's" men in exchange for their protection. (Doc. 285 at 6.) Michael disciplined Gunn with sexual torture when she was not obedient to "the Order." (Doc. 285 at 6.) Gunn told Michael that she no longer wanted to prostitute herself, but that he could have the girl child do so instead. (Doc. 285 at

7.)  Together, the couple told the child about "the Order" and the need to stay loyal to it.  (Doc. 285 at 7.)  It was then that the 13 to 14-year-old child "was made to have sex with several men in a 24-hour period."  (Doc. 285 at 7, 11.)  The child also had to watch Gunn perform oral sex on Michael "to learn."  (Doc. 285 at 8-9.)  Michael had the child take photographs and videos of herself in sexual poses.  (Doc. 285 at 9.)  Michael also took nude photos of the child while Gunn was present.  (Doc. 285 at 7.)  Michael posted the imagery on various online platforms where he also booked appointments for the child to provide sexual services to men.  (Doc. 285 at 9.)  The child provided Michael with the proceeds from the encounters.  (Doc. 285 at 9.)  Jonathan Grantham was one of the men with whom the child had at least four of these sexual appointments.  (Doc. 285 at 9.)  And, when the child did not follow Michael's rules regarding the sexual arrangements, he would sexually punish her.  (Doc. 285 at 7.)

The FBI found a pornographic photo of the child, which it traced back to Gunn and Michael.  (Doc. 285 at 6.)  The FBI conducted a "knock and talk" with Gunn and Michael, but they denied knowing about the child pornography.  (Doc. 285 at 6.)  After the FBI left, that same day, Michael had the child erase the contents of her iPhone, which contained nude photos of the child with adult men.  (Doc. 285 at 7.)  He instructed her to, then, throw the phone behind a pavilion near the home.  (Doc. 285 at 7.)  Gunn promised to buy the child a new iPhone.  (Doc. 285 at 7.)  Gunn and Michael also threw out a bag of lingerie that Michael made the child wear.  (Doc. 285 at 7.)  The FBI returned the next day to search the Gunn home for a pair of shoes

that was visible in some of the child pornography.  (Doc. 285 at 6.)  The FBI found the shoes, which the child identified as belonging to Michael, which she also said he wore while taking the photos.  (Doc. 285 at 6.)  Michael was arrested.  (Doc. 285 at 6.)  Gunn asked the child to change her story, and to tell the FBI that she panicked and made everything up.  (Doc. 285 at 7-8.)  The child stood firm.  (Doc. 285 at 8.)  After being "interviewed many times," Gunn made a statement to police about Michael forcing her into prostitution.  (Doc. 285 at 6.)  She stated that while she felt like the behavior between Michael and the child was odd, she did not know he was abusing the child.  (Doc. 285 at 7.)  She further stated that it was only after Michael's arrest, when she visited him at the jail, that she started to believe that he may have abused the child.  (Doc. 285 at 7.)

### 2.   *Offense-Level Computation.*

Based on the offense conduct, coupled with her acceptance of responsibility, the PSR determined Gunn's total offense level was 38.  (Doc. 285 at 12.)  And, because she had no previous criminal convictions, her criminal history category was I.  (Doc. 285 at 13.)  Her total offense level, combined with her criminal history category, calculated her advisory-guideline imprisonment range as between 235 and 293 months.  (Doc. 285 at 17.)

### G.   *Gunn Received Low-End Guideline Sentence.*

### 1.   *PSR Adopted and Defense's Mitigation Presentation.*

There being no objections to the PSR, the Court adopted the PSR's findings and determined that Gunn had a total offense level of 38 with a criminal history

category of I and an advisory guideline range of 235 to 293 months' imprisonment. (Doc. 333 at 3.)  The Court heard from the defense regarding its case in mitigation. (Doc. 333 at 8.)  The defense asked for the mandatory-minimum prison sentence of 15 years that the Government agreed to recommend pursuant to the plea agreement. (Doc. 333 at 10, 39.)  The defense argued that Gunn "agreed to testify against her co-defendant and plead guilty to the crimes she was charged with all in hopes of avoiding a trial and freeing her daughter of this burden."  (Doc. 333 at 10.)  Gunn made a personal statement to the Court followed by the minor victim.  Gunn apologized to her daughter, stating that "I was supposed to be her protector, and I failed her.  I should have seen all the signs, and it is my fault for allowing that monster into our lives." (Doc. 333 at 19.)  The victim asked the Court "that there be as much leniency as possible." (Doc. 333 at 23.)  She told Gunn, "I know you feel bad for what happened, but I also know you should have protected me and you didn't."  (Doc. 333 at 23.)

### 2.    *Government's Motion for Downward Departure.*

Next, the Court heard from the Government.  (Doc. 333 at 23.)  The Government presented its reasons for its U.S.S.G. § 5K1.1 motion for downward departure, asking the Court to impose the mandatory-minimum prison sentence of 15 years.  (Doc. 333 at 25.)  The Government explained that it offered Gunn the plea agreement in exchange for a potential downward-departure motion because it believed her testimony would have been significant to undermine Michael's potential defense that it was Gunn who took the photographs, and not him.  (Doc. 333 at 34-35.) The Government believed Gunn's testimony would have provided "corroboration

for the minor victim's testimony that it was her father doing these things, not her mother." (Doc. 333 at 34.) The Government acknowledged that Gunn accepted the plea agreement "at the last minute" on "the day of the pretrial conference." (Doc. 333 at 35.) But, the Government heavily weighed the victim's request for a prison sentence of 15 years. (Doc. 333 at 26, 31.) The Government evaluated Gunn's trial testimony as "75 percent honest" since Gunn was present in the home during her daughter's sexual abuse though Gunn claimed ignorance. (Doc. 333 at 31.) Still, the Government explained that "[t]he parts that she was not honest about, I'm not sure if that's because she doesn't want to admit in front of her family and friends all of those things that she witnessed or maybe it's just simply because she can't admit it to herself." (Doc. 333 at 25.)

### 3.   *Court's Pronouncement of Sentence.*

After considering the PSR, the advisory guideline range, Gunn's mitigation presentation, the victim's statement, and the Government's motion for downward departure, the Court sentenced Gunn to 235 months' imprisonment. (Doc. 333 at 40-41.) The Court reasoned that the "incredible abuse" suffered by Gunn warranted a low-end guideline sentence. (Doc. 333 at 41.) However, the Court found no reason to depart from the guidelines, reasoning that Gunn's personal statement that "I should have known what was happening in my home" was inconsistent with the PSR. (Doc. 333 at 28-30.) The Court specified that the PSR stated that Gunn was present when Michael took nude photos of the victim; that Gunn told Michael to prostitute the minor victim after which the victim was forced to have sex with several men at the

16

family's home in a 24-hour period; and that Gunn performed sex on Michael in the victim's presence so that the victim learned to perform accordingly.  (Doc. 333 at 28-30.)  Gunn did not object to the Court's "findings of fact, its conclusions of law or to the manner in which the sentence was pronounced."  (Doc. 333 at 47.)  Nor did she directly appeal.

Now, Gunn brings this § 2255 motion to vacate her conviction and sentence. (Doc. 327.)  She is currently incarcerated at FCI Aliceville, located in Aliceville, Alabama with a projected release date of November 15, 2037.[4]

## Argument

Gunn raises claims regarding the pre-trial, guilty-plea, and sentencing phases of her case.  However, her claims are procedurally barred.  They are barred by the collateral attack waiver in her plea agreement.  They are also procedurally defaulted, and Gunn has not shown cause and prejudice to overcome the default.  Accordingly, the Court should dismiss Gunn's motion.

### A.    *Gunn's claims are barred by her collateral attack waiver.*

Gunn's claims are barred by the collateral attack waiver in her plea agreement. Where a defendant knowingly and voluntarily entered into a plea agreement and waiver, and where the defendant's appeal or collateral challenge falls within the scope of that waiver, the waiver is valid and must be enforced.  *See United States v.*

---

[4] BOP Inmate Locator, *available at* https://www.bop.gov/inmateloc/ (last visited Mar. 20, 2023). Projected release date indicates release from BOP custody and may not reflect date by which BOP will consider defendant for placement in a halfway house, a residential reentry center or home confinement.

*Hardman*, 778 F.3d 896, 899 (11th Cir. 2014); *United States v. Johnson*, 541 F.3d 1064, 1066 (11th Cir. 2008).

### 1.   *Gunn's § 2255 motion is within the scope of the waiver.*

First, Gunn's § 2255 motion is within the scope of her collateral attack waiver. The plea agreement's collateral attack waiver—which the Court read verbatim at Gunn's Rule 11 hearing—contains only one narrow exception: "that Defendant may collaterally attack her conviction and sentence based on a claim of ineffective assistance of counsel." (Docs. 233 at 9; 334 at 12.) Gunn's § 2255 motion raises no such claim. (Doc. 327.) Thus, her motion falls within the collateral attack waiver's scope. *See Hardman*, 778 F.3d at 899; *United States v. Grinard-Henry*, 399 F.3d 1294, 1296 (11th Cir. 2005); *see also United States v. Howle*, 166 F.3d 1166, 1169 (11th Cir. 1999).

### 2.   *Gunn's waiver was knowing and voluntary.*

Second, Gunn's collateral attack waiver, as part of her guilty-plea agreement, was made knowingly and voluntarily. For a guilty plea to be knowing and voluntary, the court accepting the plea must "specifically address three 'core principles,' ensuring that a defendant (1) enters his guilty plea free from coercion, (2) understands the nature of the charges, and (3) understands the consequences of his plea." *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005). Here, the Court's lengthy and detailed plea colloquy ensured that each of the above core principles was met.

The Court confirmed with Gunn that she wanted to change her plea to guilty. (Doc. 334 at 4.)  It asked Gunn if "anyone threatened, pressured or forced [her] to come into court . . . and change [her] plea to guilty," and Gunn, responded, "No, sir." (Doc. 334 at 5.)  It asked Gunn whether she had enough time to talk to her attorney about her plea agreement, and Gunn answered, "Yes, sir." (Doc. 334 at 8.)  The Court asked Gunn whether she carefully reviewed the plea agreement with her attorney before signing it, and she stated that she did.  (Doc. 334 at 10.)  The Court also reviewed with Gunn the offenses with which she was charged in the superseding indictment, and asked her whether she had seen the indictment and reviewed it with her attorney. (Doc. 334 at 8.)  Gunn answered, "Yes, sir." (Doc. 334 at 8.)  The Court discussed with Gunn the potential penalties, including the statutory prison range of 15 years to life. (Doc. 334 at 13.)  The Court explained that she would have to fully serve, at least, the mandatory-minimum sentence of 15 years in custody.  (Doc. 334 at 13.)  Gunn stated that she understood.  (Doc. 334 at 13.)

The Court also reviewed with Gunn specific provisions of the plea agreement, including the Government's promise to recommend a prison sentence of 15 years. (Doc. 334 at 11.)  But, the Court reminded Gunn that it could still sentence her above, below, or within her guideline range, which was only advisory. (Doc. 334 at 16.)  Gunn stated that she understood and had no questions.  (Doc. 334 at 16.)  And, the Court instructed her to "[l]isten very carefully" while it read to her the waivers of her appellate and collateral-attack rights contained in the plea agreement. (Doc. 334 at 12.)  Gunn stated that she understood the waivers. (Doc. 334 at 12.)  The Court also

discussed the constitutional jury-trial rights Gunn waived by pleading guilty.  (Doc. 334 at 10.)  Still, Gunn said that she wished to waive these rights and plead guilty to the sex trafficking conspiracy because she was "in fact, guilty of committing the crime."  (Doc. 334 at 10, 40.)  Moreover, at her co-defendant's trial, the prosecutor asked Gunn, "Did you make a decision to plead guilty?"  (Doc. 270 at 48.)  Gunn answered, "Yes, ma'am."  (Doc. 270 at 48.)  The prosecutor asked, "And why did you decide to plead guilty?"  (Doc. 270 at 48.)  Gunn answered, "Because I knew I had failed to protect my daughter."  (Doc. 270 at 48.)  Gunn echoed this testimony during her mitigation presentation at sentencing.  (Doc. 333 at 10.)

Consequently, Gunn entered into the plea agreement and waived her collateral-attack rights knowingly and voluntarily.  The Court should enforce the collateral attack waiver and dismiss her motion.

### B.     No Cause or Prejudice to Overcome Procedural Default.

In addition to being barred by her collateral attack waiver, Gunn's claims are also barred by the doctrine of procedural default (absent a showing of cause and prejudice) because they were not raised on direct appeal.  *See Massaro v. United States*, 538 U.S. 500, 504 (2003) (holding that claims not raised on direct appeal "may not be raised on collateral review unless the petitioner shows cause and prejudice"); *see also United States v. Montano*, 398 F.3d 1276, 1279-80 (11th Cir. 2005) ("Generally, if a challenge to a conviction or sentence is not made on direct appeal, it will be procedurally barred in a § 2255 challenge.").  For cause, the petitioner must show that some external impediment prevented her from raising the claim on direct

appeal. *Bousley v. United States*, 523 U.S. 614, 623 (1998); *see also Weeks v. Jones*, 52 F.3d 1559, 1561 (11th Cir. 1995). For prejudice, she must show "not merely that the errors at [her] trial or sentencing created a possibility of prejudice, but that they worked to [her] actual and substantial disadvantage, infecting [her] entire trial or sentencing with error of constitutional dimensions." *Brown v. United States*, 720 F.3d 1316, 1333 (11th Cir. 2013) (cleaned up). Gunn shows neither cause nor prejudice.

### 1.   *No Cause.*

As to cause, Gunn merely states that she did not raise her claims on direct appeal because she "[d]id not know [she] could." (Doc. 327 at 4, 5, 9.) But, ignorance or lack of knowledge cannot excuse a procedural default. *Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993); *McCoy v. Newsome*, 953 F.2d 1252, 1258 (11th Cir. 1992) ("A petitioner's failure to act or think like a lawyer cannot be cause for failing to assert a claim . . .") (cleaned up); *Harmon v. Barton*, 894 F.2d 1268, 1275 (11th Cir. 1990); *Toole v. McDonough*, 379 F. App'x 883, 885 n.5 (11th Cir. 2010) (rejecting petitioner's contention that his pro-se status and lack of legal knowledge constituted an external impediment to justifying his failure to exhaust his claim).

### 2.   *No Prejudice.*

And, Gunn shows no prejudice because her claims are without merit or otherwise belied by the record. *See Atkins v. Singletary*, 965 F.2d 952, 957 (11th Cir. 1992) (holding there was no prejudice to overcome procedurally defaulted claims where, after examination, Court determined claims had no merit); *see also Teers v.*

*United States*, 739 F. App'x 960, 967 (11th Cir. 2018) (holding habeas petitioner failed to show prejudice where claim was contradicted by the record).

### a.   *Pre-Trial Claim.*

First, Gunn claims that she was "[n]ot given the chance for a fair trial" because the jury "would have been blinded by the terrible things they would hear that my co-defendant did." (Doc. 327 at 4.) Gunn's claim is speculative and unsupported. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (holding that vague, conclusory, or unsupported allegations cannot support federal habeas relief). What is more, a U.S. magistrate judge considered and rejected Gunn's claim in its denial of her motion to sever her trial from that of her co-defendant. (Doc. 205 at 4-5.) But, Gunn failed to object to the denial or appeal it to this Court. (Doc. 332 at 15-16.) Therefore, the claim is no longer reviewable. *See* Fed. R. Crim. P. 59(a); *see also United States v. Schultz*, 565 F.3d 1353, 1359 (11th Cir. 2009). Because the claim is not reviewable, it cannot be an error that works to Gunn's actual and substantial disadvantage to meet the requisite prejudice showing to overcome the default.

Also, the motion was correctly denied because any risk of prejudice from evidence against the co-defendant could have been cured by a limiting instruction to the jury to make an individualized determination of guilt. *See United States v. Mosquera*, 886 F.3d 1032, 1042 (11th Cir. 2018) (affirming denial of severance motion where district court instructed jury unambiguously to "consider the case of each Defendant separately and individually," and cautioned them that if they "find a Defendant guilty of one crime that must not affect [the] verdict for any other crime

or any other Defendant").   And, juries are presumed to follow their instructions. *Francis v. Franklin*, 471 U.S. 307, 324 (1985) (recognizing "the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions").

Most importantly, though, the record shows that it was not Gunn's intention to have a trial.  At the Rule 11 hearing, the Court asked Gunn at least four times whether she wished to plead guilty.  (Doc. 334 at 4, 8, 10, 40.)  Each time Gunn answered in the affirmative.  (Doc. 334 at 4, 8, 10, 40.)  When the Court asked her whether she wished to waive or give up her right to a jury trial and plead guilty, she answered, "Yes, sir."  (Doc. 334 at 10.)  At no time did she break off the colloquy and demand a jury trial.  (Doc. 334 at 4-13.)  At the co-defendant's trial, Gunn testified that she made the decision to plead guilty "[b]ecause [she] knew [she] had failed to protect [her] daughter."  (Doc. 270 at 48.)  At sentencing, Gunn's counsel told the Court,

> [F]oremost in Amanda's mind in all this case was avoiding trial. She did not want to be the reason that the minor victim had to go through trial. She agreed to testify against her co-defendant and plead guilty to the crimes she was charged with all in hopes of avoiding a trial and freeing her daughter of this burden.

(Doc. 333 at 10.)  The prosecutor agreed, telling the Court that Gunn pled guilty because she "began to see the impact of this case on her daughter. The idea of her daughter having to testify in this courtroom did mean something to Ms. Gunn." (Doc. 333 at 25.)  Gunn never complained about pleading guilty to avoid a joint trial with her co-defendant.

### b.    Guilty-Plea Claim.

Second, Gunn claims that she was not given enough time to review her plea agreement.  (Doc. 327 at 5.)  Gunn's claim is belied by her answers to the Court's questions at the Rule 11 hearing.  The Court pointedly asked Gunn whether she had as much time as she would have liked to talk to her attorney about the plea agreement, and Gunn answered, "Yes, sir."  (Doc. 334 at 8.)  The Court also reviewed with Gunn the plea agreement and asked her whether she went over it carefully with her attorney.  (Doc. 334 at 10.)  Gunn answered, "Yes, sir."  (Doc. 334 at 10.)  The Court even told Gunn that she could interrupt the hearing to speak to her attorney or ask him a question "if for some reason [she] fe[lt] the need to."  (Doc. 334 at 5.)  Accordingly, the Court should decline Gunn's belated invitation to ignore her solemn declarations in open court in favor of her self-serving allegation.  *Gambrel v. United States*, No. CV 112-126, 2013 U.S. Dist. LEXIS 106766, at * 40 (S.D. Ga. May 17, 2013); *United States v. Stitzer*, 785 F.2d 1506, 1514 n.4 (11th Cir. 1986).  And, as discussed above, Gunn's guilty plea was knowingly and voluntarily entered.

### c.    Sentencing Claim.

Third, Gunn complains that the Government withdrew its § 5K1.1 motion for downward departure "at the last minute."  (Doc. 327 at 6.)  However, the record reflects that the Government did not withdraw the motion.  (Doc. 333 at 25.)  At sentencing, the Government argued the motion and, as promised, asked for the mandatory-minimum prison sentence of 15 years.  (Doc. 333 at 25.) The Government explained that Gunn's testimony was significant for the Government's case against

the co-defendant and that her testimony at his trial was "75 percent honest." (Doc. 333 at 31, 34-35.) It further stated that this was the sentence that the victim requested. (Doc. 333 at 26, 31.) However, the Court denied the Government's motion based on Gunn's personal statement failing to acknowledge her full role in the conspiracy. (Doc. 333 at 28-30.) To the extent Gunn challenges the Court's denial, the decision is not reviewable. *See, e.g.*, *United States v. Gonsalves*, 121 F.3d 1416, 1419 (11th Cir. 1997).

Nor is Gunn's challenge to her sentence cognizable. "Section 2255 does not provide a remedy for every alleged error in conviction and sentencing . . . [A] district court lacks the authority to review the alleged error unless the claimed error constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Spencer v. United States*, 773 F.3d 1132, 1138 (11th Cir. 2014) (brackets, quotations, and citations omitted). "When a federal prisoner, sentenced below the statutory maximum, complains of a sentencing error and does not prove either actual innocence of his crime or the vacatur of a prior conviction, the prisoner cannot satisfy the demanding standard that a sentencing error resulted in a complete miscarriage of justice." *Id*. at 1139. Accordingly, because Gunn's sentencing challenge is not reviewable or cognizable (if not wholly belied by the record) it cannot meet the actual-prejudice standard. Consequently, Gunn fails to overcome the procedural default for her claims, and her motion should be dismissed.

## Conclusion

For the above reasons, this Court should dismiss Gunn's § 2255 motion.

Respectfully submitted,

JILL E. STEINBERG
UNITED STATES ATTORNEY

*//s// Channell V. Singh*
Channell V. Singh
Assistant United States Attorney
Georgia Bar No. 216540

P.O. Box 8970
Savannah, Georgia 31412
(912) 652-4422

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") that was generated as a result of electronic filing in this Court.  In addition, I mailed a paper copy via U.S. Postal Service to:

> Amanda Gunn, Reg. No. 33621-509
> Inmate Legal Mail
> FCI Aliceville
> Federal Correctional Institution
> P.O. Box 4000
> Aliceville, AL 35442

This March 20, 2023.

Respectfully submitted,

JILL E. STEINBERG
UNITED STATES ATTORNEY

*//s// Channell V. Singh*
Channell V. Singh
Assistant United States Attorney
Georgia Bar No. 216540

P.O. Box 8970
Savannah, Georgia 31412
(912) 652-4422